782 A.2d 332

**In re MARK M.**

**No. 131, Sept. Term, 2000.**

Court of Appeals of Maryland.

Oct. 5, 2001.

Martha V. Weisheit, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

BATTAGLIA, Judge.

In the matter now before this Court, we must consider whether the District Court, Montgomery County, Juvenile Division improperly delegated its authority to determine visitation to an administrative agency, the Montgomery County Department of Health and Human Services in ordering that

petitioner, Helen M.,[1] be denied visitation until the state-appointed therapist recommended otherwise and by denying Helen M.'s motion for an independent psychological evaluation of Mark M. made pursuant to Md. Rule 11–105 and Maryland Code, Section 3–818 of the Courts and Judicial Proceedings Article (1984, 1998 Repl.Vol.).[2]

## I. Facts

Mark M. was born on July 5, 1994, the son of Helen M. and Michael M. At the time of his birth, Mark M. had two older sisters, Jennifer C., whose father was William C., and Mary M., whose father was Donald M.[3] On March 21, 1995, after investigating allegations of abuse, the Montgomery County Department of Social Services ("DSS" or "DHHS") filed a petition with the District Court, Juvenile Division, asserting that Mark M. and Mary M. should be declared children in need of assistance (CINA).[4] The CINA petition filed on behalf of Mark and Mary set forth the following facts concerning the home life of these children:

> Investigation has noted that [Helen M.] and Mary's father, [Donald M.] have had a history of problems in their relationship including allegations of physical violence, neglect of

**1.** At an earlier phase of this proceeding, the petitioner was known as Helen J. She married Bruce M. in 1998 and is now known as Helen M. Therefore, we will refer to petitioner as Helen M. throughout this opinion.

**2.** Although amendments were made to Title 3, Subtitle 8 of the Courts and Judicial Proceedings Article by the 1999 and 2000 Maryland Laws, the provisions of the Courts and Judicial Proceedings Article cited herein appeared unaltered in the 2000 Supplement.

**3.** Jennifer C. was born on September 16, 1980, and Mary M. was born on February 1, 1991.

**4.** Section 3–801(e) of the Courts and Judicial Proceedings Article of the Maryland Code (1984, 1998 Repl.Vol.) states:
 "Child in need of assistance" is a child who requires the assistance of the court because:
 (1) The child is mentally handicapped or is not receiving ordinary and proper care and attention; and
 (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason that the child is being furnished nonmedical remedial care and treatment recognized by State law.

Mary and substance abuse. The most recent referral noted concern that on / about March 19, 1995, conflict ensued between [Helen M.] and [Donald M.], following which [Donald M.] took Mary from [Helen M.'s] home. According to [Donald M.], he went to [Helen M.'s] home after attempting to contact [Helen M.] by telephone to arrange a visit. Mary came to the door, explaining that her mother and brother were sick. According to [Donald M.], [Helen M.] appeared to be suffering from a hangover and she was angry about his appearance at the home. [Donald M.] reported that he took Mary after he observed [Helen M.] grab Mary by the top of her hair and drop her to the floor and then slap her in the face three times.

Investigation has further noted that the police responded to [Helen M.'s] home on / about March 19, 1995 at [Helen M.'s] request. The police noted that [Helen M.] alleged that [Donald M.] had assaulted her and it was noted that she had a small scratch on her arm. Concern was noted that [Helen M.] initially did not report to the police officer any injury to others in the household besides herself. Later on March 19, 1995, when [Helen M.] was making a formal complaint of assault against [Donald M.], she stated that Mark had fallen from her arms when [Donald M.] assaulted her. The police noted further concern that in subsequent contact with [Donald M.] and Mary, allegations were made that [Helen M.] was physically abusive to Mary.

At that time, the DHHS also requested emergency shelter care for Mark M. and Mary M. pending the decision on the CINA petition.

On March 21, 1995 the juvenile court entered an order placing Mark M. under the jurisdiction of the court and committed him to DHHS to be placed in foster care. Mark M. was placed in the care and custody of his maternal aunt, Jane B. At the adjudication hearing for the CINA petition held on April 19, 1995, the juvenile court determined Mark M. and his sister Mary M. to be children in need of assistance. The court's order allowed for supervised visitation between Helen M. and Mark M.

By May of 1995, Mark M.'s foster mother, Jane B., indicated that she could no longer care for Mark M. in her home. Helen M. agreed to cooperate with DHHS and participate in alcohol treatment programs, and the court ordered that Mark M. be returned to the care and custody of his mother. The order also prohibited contact between Helen M. and Bruce M., her new boyfriend, since the report of DHHS noted that Helen M. resided in a one bedroom trailer, where her daughter Jennifer C. slept on a sofa bed, Mark M. slept in a crib in the bedroom, and Mary M. slept in the bed with her mother and Bruce M.

On November 21, 1995, DHHS sent a letter to the juvenile court indicating that Bruce M. was residing with Helen M., according to his probation officer, in contravention of the no contact order between Helen M. and Bruce M. In response, the juvenile court entered a more specific order on November 24, 1995, stating that Bruce M. shall have no contact with Mark M. or Mary M., including no contact at or with the home of Helen M.

In April of 1996, Josiane Traum, a social worker for DHHS, who had been working with Helen M. and her children, experienced difficulty contacting and communicating with Helen M. On May 3, 1996, Ms. Traum went to the townhouse where Helen M. had been living and found it vacant. The landlord also had discovered, on May 1, 1996, that the premises had been vacated and that Helen M. had taken the keys with her. The townhouse had been left in a state of disarray, with holes punched into the walls and numerous cases of empty beer bottles lying about.

In a subsequent interview with William C., Jennifer C.'s father, Ms. Traum learned that at some point in the middle of April, 1996, Helen M. brought Jennifer to William C's home stating, "I've had her for the past fourteen years and I've had it, it's your turn now." On May 15, 1996, Helen M. failed to appear for the regularly scheduled review hearing before the court. At this hearing, DHHS recommended that Mark M. be placed with his paternal grandmother, Peggy M. Mark M.,

though, could not be found, because Helen M. had left Maryland with him. Thus, the court issued a warrant for her arrest.

Over the next two years efforts were made to investigate and locate Helen M. and Mark M. In June of 1998, the Fugitive Unit of the Montgomery County Police located Helen M. and her children at a trailer in West Virginia, whereupon Helen M. once again attempted to flee. Helen M.'s children now included another son, Damon M., and another daughter, Andrea M.

An emergency hearing was held on June 25, 1998, regarding placement of Mark M. in the custody of his paternal grandmother, Peggy M., without the presence of Helen M., who was incarcerated in West Virginia. Josiane Traum, the social worker assigned to the case, reported that Mark M. had many marks and bruises on his body when he was found and further noted:

There are many concerns regarding the violence which Mark has been exposed to while living with his mother and [Bruce M.]. It is not known exactly where [Helen M.] was living for the past two years, what is known is that she and her boyfriend, Bruce had moved around to California, Florida and West Virginia. [Helen M.] has had another baby, Andrea (DOB 4/22/97) and is currently pregnant. [Bruce M.] was charged for assault and battery of [Helen M.] while in California and living with her. Mark has talked about daddy Bruce and Mommy spanking him with their fists and how they have thrown television sets around trying to hit each other.

When Mark first returned to the area, he was taken to Shady Grove Hospital for a physical check and due to the many markings and bruises he had on his body. When asked if he wants to return to his mother, Mark expressed tremendous anger and ran out of the room not wanting to speak to this writer any more. Dr. Salness stated that, "Mark demonstrated anger with clenched fists held with bent elbows stiff on the side and holding his breath until his

face turned red and staring straight ahead and refusing to speak or move and then stated 'You make me so angry' and this was following when he was questioned what had made the marks on his arm, his back and his knee."

The court's order of June 25, 1998, directed that Mark M. be placed immediately with Peggy M., and that Helen M. and Michael M., Mark M.'s natural father, receive supervised visitation with Mark M. under the direction of DHHS. The court further ordered that there be no contact between [Bruce M.] and Mark M., and that Bruce M. not visit the home where Mark M. was living. The court ordered that Mark M. reside with his paternal grandmother, Peggy M., and that as Mark M.'s custodian, Peggy M. would be able to consent to such medical, educational, and ordinary treatment, as necessary in Mark M.'s best interest. On June 29, 1998, the court again ordered Bruce M. to have no contact with Mark M. since he had gone to Peggy M.'s house in an attempt to frighten her and take Mark M.

During this period of time, Helen M. was incarcerated in West Virginia and in the Montgomery County Detention Center where she remained until August 10, 1998 when she pled guilty to the charge of obstruction of justice and was released. She then seemingly disappeared, without contacting Peggy M., DHHS, or the court.

On January 14, 1999, the court entered an Order for Limited Guardianship authorizing Peggy M. to serve as Mark M.'s primary guardian, for the limited purpose of signing forms, materials and authorizations concerning Mark M.'s medical, educational, psychiatric and psychological needs. In subsequent documentation sent to the court in anticipation of the next regularly scheduled review hearing, the DHHS social worker, Josiane Traum, wrote:

At this time the Department recommends that [Mark M.] remain in the care and custody of his paternal grandmother. She is giving him the love, security and consistency which he needs in his life. Mark shows signs of being very secure with her and she is seeking all the supportive services which

Mark needs. He needs to continue to feel that he is safe. [Helen M.] has not responded to any of the recommendations or requests from the Department. She has shown no interest as to how Mark is doing ... nor has she asked to visit with him.

Ms. Traum also noted that the permanency plan developed by DHHS for Mark M. had been changed from "Return to Parent" to "Adoption" by Peggy M.

At the review hearing held on May 20, 1999, Helen M.'s attorney asserted that Helen M. had not seen Mark M. because she disliked the social worker, Ms. Traum, who handled the case. DHHS representatives asserted that they had tried to facilitate visitation through correspondence with Helen M., all of which had gone unanswered, and which had ostensibly not reached Helen M., since she did not reside at the address she had provided to DHHS. Following the presentation of arguments, the court stated:

Ms. Long, I feel ... I would not want to be in the position that you're in. Your client absconded with her child, she's played games with the Court. And today she comes to Court and has ... whatever you might call it, courage to tell us that she really has one address that no one's there at. That she's been unable to be found, and yet she cares for the child. And that she should have credibility with the Court, requesting that we make adjustments for her comfort.

I'm sorry that you have to make those arguments, because this woman has done so little in this case that is positive, it's hard for me to listen to her complaint. And I know that it must be hard for you to make those arguments. And I'm sorry for your discomfort.

I think that it's really quite shocking that she ... has done what she's done and acts, wants us to forget it, I guess, I don't know what the issue is here.

This child, for the first time in a long time is having some stability, is undoing, I hope the people that you're working with are undoing some of the damage that's been done, in

no small measure of the mother's treatment of the child, ripping him out of here when she had a belief of what the Court was going to do, she just boogied, it took the West Virginia State Troopers to find her, and this child.

She has ... uh, more than courage, something else, I don't know what to call it, to come in here and try and tell us that we ought to make her comfortable about visitation, when from all I can tell, she hasn't made an effort to stay in contact or have an address, and if she changed her address because the house was burned, and if she really wanted to see this child, she would have called Josie Traum. But hated Josie Traum, what a terrible person you are. I just think that this is unbelievable. And, uh ... to me, it shows a chilling lack of real care for the child, and more interest in having her way, when she wants it.

If the mother decides that she wants to approach this situation with the child in a responsible manner the Court will certainly be responsive, to her. But, the way that she's been playing this, to this point, is uh ... shocking. And again, I repeat, someone who basically thumbed their nose at the Court, a few years ago, took the child away from any observation by the Court, attempting to, whatever her purpose was, uh, and then comes in here and starts demanding. It makes it uh, difficult to understand, uh ... why we should uh ... be moving in the direction that she wants us to move.

Having said all that, and ... that doesn't mean that we'll never hear her, that we won't give her a chance to turn things around, because we all know that addiction is a disease that makes people do, if they didn't have it, and if she does get that under control, she may be able to uh ... uh, have more contact with the child, on a regular basis, and be a positive force in his life. Right now it's hard to see how that has happened, without the ... in fact it hasn't been.

The most important thing that we have here today I think is the fact that the child is, seemed to have stability, and that's not for anything the mother's done. Anyone else?

The child will remain committed to the Department, under the Court's jurisdiction, [t]he visits between Mark and his father and his mother will be under the direction of the Department. The no contact order, regarding [Bruce M.] is reaffirmed. Mother will continue to provide the Court an address where she's residing. If she doesn't do that, it doesn't do much to help her reunite with this child. She'll participate in a drug and alcohol treatment program under the direction of the Department and provide verification to DHHS.

I don't need six parenting classes, not now. She's not going to have care and custody of this child until she's made a great change in her own life. She's not going to be able to do that, parenting on a regular basis. I hope she gets it. Permanency plan for adoption by the paternal grandmother is approved.

On June 16, 1999, Helen M. filed a Motion for Order to Enforce Visitation. She asserted that she had wanted to visit with Mark M., but that Ms. Traum had refused to schedule visitation unless Helen M. consulted with Mark M.'s therapist, Dr. Robert A. Lazun. On June 17, 1999, a Petition for Guardianship With Right to Consent to Adoption or Long-Term Care Short of Adoption was filed on behalf of Mark M.

In response to Helen M.'s motion, counsel for Mark M. formally agreed with Ms. Traum's recommendation that Helen M. meet with Mark M.'s therapist, Dr. Lazun, before she could visit with Mark M. Counsel argued that the request was proper and reasonable under the circumstances because up to that point, Helen M. had not had contact with or requested to have contact with Mark M. in over a year, and Ms. Traum and Dr. Lazun were in the best position to understand Mark M.'s progress and needs.

Dr. Lazun, the child therapist who had been treating Mark M. at the Reginald S. Lourie Center since he had been placed in the custody of his grandmother, submitted a letter to the court on August 18, 1999, stating:

[Mark M.] has been in child therapy with me since July 24, 1998. He began therapy with me as a frightened, vulnerable child who would not let go of his paternal grandmother's hand. He had recently been placed in her care after experiencing two-three years of neglect and abuse at the hands of his birth mother.

While in therapy with me at The Lourie Center over the past thirteen months, he has told me that his mother and "Bruce" [Bruce M.] punched him in the face, kicked him when he was lying on the floor, spanked him a lot and banged his head against the wall. He has also told me that he does not want to see his mother because "she is mean."

It is my judgment that although Mark has made great strides in learning to trust the world around him and the people who love him, he continues to fear his mother and [Bruce M.] with great intensity.

It would not be in Mark's best interest to make him visit his mother. It would be better to allow him to grow in the stability and love of the life his paternal grandmother is providing him and in the school program that he is just beginning to undertake.

The court held a hearing on Helen M.'s motion for visitation on October 1, 1999. Helen M. argued that the court's previous order regarding visitation left the discretion concerning the amount of visits she could have with her son up to the discretion of DHHS, and that the agency had chosen to refuse any visitation. Helen M. presented one witness, her addictions counselor, Perry Nerantzis, who testified that Helen M. was enrolled in an addictions counseling program and was being treated for a panic disorder, depression and alcohol dependence.

Peggy M. testified concerning Mark M.'s progress and his positive adjustment since living with her. She discussed Mark M.'s behavior when he was brought to her at the police station after being returned from West Virginia:

Uh, he, he said his mom was arrested, the police got her. And I said oh, and he said they arrested my mom because

she's mean to me and hits me.... When his mother would ... whenever anybody would say anything about his mom or say something, he would just say, he didn't like his mom, he didn't want to be around his mom. Mom and Bruce were mean to him. Mom and Bruce hit him, and that Bruce would hit him with the hand, but his mom used a stick and also her fist and her knuckles and he would show me how she would hit him. Like if he was trying to do his shoes or something like that.

He would make comments and then he would stop. And I never really pursued it, I listened to him, but my purpose wasn't to ... to tear at him, but he would tell me that they were mean, and that he didn't want to see them, he didn't want to talk to them ... he would be extremely, very angry.

Dr. Lazun also testified, relating incidents during the course of his treatment in which Mark M. manifested his fear and anger. Dr. Lazun explained how difficult it had been to establish a trusting relationship with Mark M. to the point where Mark M. felt comfortable even beginning to express his feelings concerning his mother. He recommended that Mark M. have no contact with his mother at this time because to do so would cause a regression in the progress that had been made in Mark M.'s treatment.

During the course of this hearing, Helen M. also made an oral motion to have Mark M. evaluated independently by a qualified child therapist of her choosing. She did not, however, proffer to the court who would be conducting the examination or its scope. In denying the motion, the Court declared that it would not be in Mark M.'s best interest to have another therapist attempt to establish a relationship of trust with Mark M., as it would thwart the progress that had been made in Mark M.'s therapy. The juvenile court denied the motion, stating:

I see no reason to have another evaluation, uh ... because first of all, I see no reason not to credit Dr. Lazun's testimony, he's worked with the child for more than a year. Uh ... and even with Dr. Lazun, uh ... initially there was

fragility and uh ... he, the child I think would uh ... perhaps it would be difficult for the child to have another therapist come in, uh ... and try and uh ... see where he is, at this point in time. I think that at a later point in time, if the Department continues to take the position that visitation shouldn't occur, and ... there's some indication that it might not be against his interest, uh ... then we would perhaps consider it then.

The juvenile court then entered the following order:

[Mark M.] remain under the jurisdiction of the Court and committed to the Department. Motion to enforce visitation is denied. [Mark M.] is to remain with his paternal grandmother [Peggy M.]. [Mark M.] will participate in individual therapy. Mother will participate in individual therapy Drug Treatment at OAS and provide verification to MCDHHS, participate in urinalysis under the direction of the department, OAS results to be provided to DHHS. Visitation will not occur until his therapist recommends it. There will be no contact by [Mark M.] with [Bruce M.]. Mother will provide DHHS with her current address at all times.

At the November 4, 1999 review hearing, the juvenile court refused to reconsider its ruling. Thereafter, Helen M. appealed to the Court of Special Appeals, asking it to consider whether the juvenile court improperly ordered that visitation between Mark M. and Helen M. be withheld pending approval of Mark M.'s therapist, whether there was a sufficient basis for the juvenile court to deny all visitation, and whether the juvenile court abused its discretion in denying Helen M.'s request to have Mark M. evaluated by a therapist of her choosing.

In an unreported decision, the Court of Special Appeals held that the juvenile court's order did not improperly delegate judicial authority to determine the minimal level of visitation with the child to the DHHS-appointed therapist, but rather the juvenile court order was effectively a denial of all visitation between Helen M. and Mark M. with an allowance for greater

access to the child upon recommendation of the child's therapist.

With regard to the denial of Helen M.'s motion to have Mark M. evaluated by an independent child therapist, the Court of Special Appeals affirmed the ruling of the juvenile court, finding no abuse of discretion. The Court of Special Appeals reasoned that the decision is left within the sound discretion of the court and such a motion should be granted based on a showing of good cause and where it is in the best interests of the child.

Helen M. filed a Petition for a Writ of Certiorari with this Court on November 27, 2000. We granted the petition to consider the following issues:

1. Was it improper for the juvenile judge to order that visitation between the Petitioner and her son be withheld until such time as the child's therapist recommended it?

2. Where the juvenile judge relied primarily on the recommendations of the child's therapist in fashioning his orders, was it an abuse of discretion to refuse to allow Petitioner to have the child examined by her own psychiatric expert?

## II. Discussion

### A. The trial court's order regarding visitation

The legal principle fashioned by this Court in *In re Justin D.*, 357 Md. 431, 745 A.2d 408, (2000), was that a trial court may not delegate judicial authority to determine the visitation rights of parents to a non-judicial agency or person. *Id.* at 447, 745 A.2d at 417. While determinations concerning visitation are generally within the sound discretion of the trial court, *see Beckman v. Boggs,* 337 Md. 688, 703, 655 A.2d 901, 908 (1995), not to be disturbed unless there has been a clear abuse of discretion, *see Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016, 1023 (1994), where a trial court's order constitutes an improper delegation of judicial authority to a non-judicial agency or person, the trial court has committed an

error of law, to be reviewed by appellate courts *de novo. See Register of Wills for Baltimore County v. Arrowsmith,* 365 Md. 237, 778 A.2d 364 (2001)(stating that "consistent with review for all questions of law, the Court of Appeals of Maryland reviews the order and judgment *de novo*"). In the case *sub judice,* we hold that the trial court's order constituted an improper delegation of judicial authority to the child's therapist, and thus was legally incorrect.

■ A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000)(stating that "the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *See also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972)(stating that "[t]he rights to conceive and to raise one's children have been deemed 'essential,'" and that "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . the Equal Protection Clause of the Fourteenth Amendment . . . and the Ninth Amendment . . ." (internal citations omitted)). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it "cannot be taken away unless clearly justified." *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998) (citing *In re Adoption No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994)).

■ That fundamental interest, however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. *See Boswell,* 352 Md. at 218–19, 721 A.2d

at 669. We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell*, 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941*, 335 Md. at 113, 642 A.2d at 208 (stating that "the controlling factor . . . is . . . what best serves the interest of the child"). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we stated in *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is "a consideration that is of 'transcendent importance' " when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted). Therefore, visitation may be restricted or even denied when the child's health or welfare is threatened.

■ We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.*, 357 Md. at 448, 745 A.2d at 417. In fact, whereas the standard for denying parental visitation is generally quite strict—i.e. "it would only be in an exceptional case and under extraordinary circumstances that the right of visitation will be denied" *Shapiro v. Shapiro*, 54 Md.App. 477, 482, 458 A.2d 1257, 1260 (1983)(citing *Radford v. Matczuk*, 223 Md. 483, 164 A.2d 904 (1960)); *see Boswell v. Boswell*, 352 Md. at 220, 721 A.2d at 670 (1998)(stating that "[v]isitation rights . . . are not to be denied even to an errant parent unless the best interest of the child would be endangered by such contact") (quoting *Roberts v. Roberts*, 35 Md.App. 497, 507, 371 A.2d 689, 694 (1977))—in cases where evidence of abuse exists, courts are required by statute to *deny* custody or unsupervised visitation *unless* the court makes a specific finding that there is no likelihood of further child abuse or neglect. *See* Maryland Code, § 9–101 of the Family Law Article (1984, 1999 Repl.Vol.). Thus, courts have a higher degree of responsibility where abuse is proven.

■ A trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests. In the case before us, the trial court took great care in considering the evidence of the abuse of young Mark M., the status of Mark M.'s emotional recovery (as testified to by both Mark M.'s guardian and therapist), the failure of petitioner to comply with prior court orders and her apparent unwillingness to satisfy those orders still in effect. After weighing these factors, the lower court found that visitation by the petitioner would be against the child's best interests, explaining that Mark M. was in an "extremely vulnerable position" with a substantial likelihood of regression from his recovery to date should he have contact with his mother. We do not dispute the lower court's findings, *per se,* nor do we dispute the court's determination to deny the motion to enforce visitation. The court's further order, however—that "[v]isitation will not occur until his therapist recommends it,"—is both facially over-broad and legally incorrect as it constitutes an improper delegation of authority to the therapist to determine whether additional visitation could occur before the court's regular review of the case (six months hence) [5] or upon earlier motion. For this reason, we enter judgment to vacate the court's ruling.

The Maryland legislature established very particular guidelines for juvenile courts when determining parental visitation rights in circumstances where child abuse or neglect has been demonstrated. Section 9–101 of the Family Law Article states:

(a) *Determination by court.*—In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or

---

**5.** Section 3–826.1(f)(1)(i) of the Courts and Judicial Proceedings Article provides that "the court shall conduct a hearing to review the permanency plan no less frequently than every 6 months...."

neglect is likely to occur if custody or visitation rights are granted to the party.

(b) *Specific finding required.*—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

Therefore, when a court has reasonable grounds to believe that abuse has occurred, as did the juvenile court in this case, visitation *must* be denied *unless* that court specifically finds that there is no likelihood of further abuse or neglect. In cases where prior abuse is evidenced, the statutory mandate is that *the court* make this specific finding. The court cannot delegate this determination to a non-judicial agency or an independent party. In the case presently before us, the juvenile court's denial of visitation was a proper exercise of its discretion; its declaration that "visitation will not occur until his therapist recommends it," however, was an improper delegation of its specific statutory obligation to make the requisite finding prior to granting visitation. *See In re Justin D.*, 357 Md. at 447, 745 A.2d at 417 (noting that jurisdiction over visitation disputes resides solely with courts of equity and "there is no authority for the delegation of any portion of such jurisdiction . . .")(quoting *Shapiro v. Shapiro*, 54 Md.App. at 484, 458 A.2d at 1262).

The Court of Special Appeals was correct to highlight the principle we articulated in *In re Justin D.*, i.e. that it would be an improper delegation of judicial authority to allow the Department to determine the minimal level of access to a child, (greater than nil) but that it would not be improper to allow the Department to allow a greater level of access to a child once the minimal level was established by the court. *See In re Justin D.*, 357 Md. at 449–450, 745 A.2d at 418. It relies on the following language in *In re Justin D.* which states:

[T]he court may not delegate its responsibility to determine the minimal level of appropriate contact between the child and his or her parent or other guardian, and, except to respond to a true and immediate emergency, it may not permit DSS to curtail, or make more onerous, the visitation allowed in the court order ... It must determine, and set forth in its order, at least the minimal amount of visitation that is appropriate and that DSS must provide, as well as any basic conditions that it believes, as a minimum, should be imposed. Beyond that, it is not inappropriate for the court to permit DSS, with the concurrence of the parent, to determine whether *additional* visitation or *less* restrictive conditions on visitation are in order .... the court may properly leave to DSS the ability to afford a parent *greater* or less restrictive access than the order directs.

*Id.* at 449–450, 745 A.2d at 418 (internal citations omitted) (emphasis in original). The Court of Special Appeals failed to recognize, however, that this principle coexists with the statutory guidelines of Section 9–101. In cases of prior abuse or neglect, a court has an *additional* statutory obligation to make a *specific finding* of "no likelihood of further child abuse or neglect" prior to sanctioning visitation beyond nil. *See* Maryland Code, § 9–101(b) of the Family Law Article. Therefore, once denial of visitation is deemed appropriate, the only method of supplying the parent with "additional visitation" is through a subsequent court proceeding where such a finding is made. It is the province of the court, not the province of the therapist, to determine when or whether visitation is appropriate.[6] While "[t]he court is entitled to rely on expert opinion in

---

6. The rigidity with which we apply this "non-delegation" principle does not signify that courts are confined to inflexible terms in issuing visitation orders. To the contrary, the courts retain an enormous amount of flexibility in issuing such orders, authority that is necessary for these courts when striving to achieve that which is in the best interest of the child. *See In re Justin D.*, 357 Md. at 447, 745 A.2d at 417 (stating that "[s]ubject to the preclusion of that kind of delegation of authority, there is a great deal of flexibility permitted in visitation orders. They run a gamut ..."). A court must not permit another agency or person to perform the very task for which the court has been

making a decision, ... the decision must be that of the court, not the expert." *In re Justin D,* 357 Md. at 447, 745 A.2d at 417. Vesting the therapist in this case with complete discretion to deny or permit visitation by the petitioner constitutes an improper delegation.

 Petitioner also contends that the court's denial of visitation until such time as the therapist recommends was, in effect, a total denial of access for an indefinite period, and such denial was wrong on the merits. Upon review of the record, we cannot agree. As we previously mentioned, it is not the court's findings (i.e. that visitation by the appellant would adversely affect Mark M.) with which we disagree, but rather we find error in the method by which the court chose to administer and implement those findings. The court's findings must be clearly reflected in the court's order, *see In re Justin D.,* 357 Md. at 450, 745 A.2d at 418, and must demonstrate the exercise of the court's own discretion, not that of a third party. Therefore, we order the judgment of the trial court vacated.

## B. Independent Medical Examination

Helen M. asserts that the juvenile court abused its discretion in denying her request to have Mark M. examined by a clinical child psychologist of her choosing pursuant to Md. Rule 11–105 and Section 3–818 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code. The Maryland Rules and the Juvenile Causes subtitle of the Courts and Judicial Proceedings Article do not create a specific entitlement to such an evaluation, nor do these provisions prohibit a judge from entertaining an order for an independent medical examination. Therefore, we must turn to the well-settled principles of statutory interpretation to guide us in ascertaining the scope and breadth of the examinations

---

so entrusted. A court's special statutory obligation to maintain a "no visitation" order until it makes an affirmative finding that further abuse is not likely, is such a task. *See* Maryland Code, § 9–101 of the Family Law Article (1984, 1999 Repl.Vol.).

contemplated by the legislature in Maryland Code, Section 3–818 of the Court and Judicial Proceedings Article.

The primary goal of statutory interpretation is "to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). The familiar point of departure for statutory interpretation is the plain language of the statute itself. *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997). When construing a statutory provision within a single statutory scheme, we must consider the statutory scheme as a whole to determine the legislative intent. *See Marsheck v. Board of Trustees of the Fire & Police Employees' Retirement System of the City of Baltimore*, 358 Md. 393, 403, 749 A.2d 774, 779 (2000); *GEICO v. Insurance Com'r*, 332 Md. 124, 131–32, 630 A.2d 713, 717 (1993); *In re Stephen K.*, 289 Md. 294, 298, 424 A.2d 153, 155 (1981). The same principles which are applied in statutory interpretation apply with equal force to our interpretation of the Maryland Rules. *See Johnson v. State*, 360 Md. 250, 264, 757 A.2d 796, 804 (2000).

Where the statutory language is clear and unambiguous and "expresses a definite and simple meaning, courts normally do not look beyond the words of the statute itself to determine legislative intent." *Board of Commissioners for Charles County, Maryland v. Toye*, 354 Md. 116, 122, 729 A.2d 407, 410 (1999). Where the language is ambiguous, however, we must look beyond the plain language of the statute to ascertain the legislative intent, taking into consideration the "purpose, aim, or policy of the enacting body." *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992). We have stated that,

> [w]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed ....We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier

and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

*Williams v. Mayor and City Council of Baltimore,* 359 Md. 101, 116, 753 A.2d 41, 49 (2000)(quoting *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987)).

■■■ Ultimately, we seek to place the statute or rule in question in the appropriate context so as to avoid an interpretation which proves absurd, unreasonable, or illogical such that it defies all semblance of common sense. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Administration,* 346 Md. 437, 445, 697 A.2d 455, 459 (1997).

We turn now to the procedural rule and statutory provision which govern independent medical examinations of individuals involved in actions commenced in juvenile court. While juvenile proceedings are considered civil in nature, they are governed by a separate set of procedural rules set forth in Chapter 11 of the Maryland Rules. *See In re Victor B.,* 336 Md. 85, 95–96, 646 A.2d 1012, 1017 (1994). Thus, in juvenile proceedings, the Maryland Rules provide for physical and mental examinations as follows:

a. Examination Procedure.

1. Order for Examination. Any order for a physical or mental examination pursuant to Section 3–818 of the Courts Article shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made. The court shall order that the examination be conducted on an outpatient basis if, considering the child's condition, that is feasible and appropriate. The order may regulate the filing of a report of findings and conclusions and the testimony at a hearing by the examining physician, psychiatrist, psychologist or other professionally qualified person, the payment of the expenses of the examination and any other relevant matters.

2. Service of Copies of Report. Copies of all studies and reports of examinations made to the court under this Rule shall be furnished by the court to counsel for the parties when received by the court, but not later than two days before any hearing at which the results of the examinations will be offered in evidence.

b. Use of Report. The report of examination is admissible in evidence as set forth in Section 3–818 of the Courts Article.

Md. Rules 11–105 (2001). Section 3–818 of the Courts and Judicial Proceedings Article states as follows:

(a) *In general.*—After a petition or a citation has been filed, the court may direct the Department of Juvenile Justice or another qualified agency to make a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case.

(b) *Examination by professionally qualified person.*—As part of the study, the child or any parent, guardian, or custodian may be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person.

(c) *Admissibility; inspection; impeachment evidence.*— The report of the study is admissible as evidence at a waiver hearing and at a disposition hearing, but not at an adjudicatory hearing. However, the attorney for each party has the right to inspect the report prior to its presentation to the court, to challenge or impeach its findings and to present appropriate evidence with respect to it.

Maryland Code, § 3–818 of the Courts and Judicial Proceedings Article (1974, 1998 Repl.Vol.).

Rule 11–105 and Section 3–818 are silent with regard to independent medical examinations other than those made by the State at the direction of the court, or by the court's order *sua sponte.* Section 3–818 was derived from the Maryland Code, Art. 26, § 62 (1951), which states, "The Judge may cause any person within the jurisdiction of the Court . . . to be examined by a physician, psychiatrist or psychologist as desig-

nated by him." This provision was amended by Chapter 432, § 2 of the Maryland Laws of 1969 to read as follows:

(a) After a petition has been filed, and at such time as the court may direct, a study and report to the court in writing shall be made by a probation officer or a qualified agency designated by the court, concerning the child, his family, his environment, and other matters relevant to the disposition of the case.

(b) If the allegations of the petition are denied, the study and report shall not be made and furnished to the court until the court makes a finding with respect to the allegations in the petition.

(c) As part of such study, the child or any parent, guardian, or custodian may be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person.

Maryland Code, Art. 26, § 70-14 (1957, 1969 Cum.Supp.). This provision was amended and recodified by Chapter 691 of the Maryland Laws of 1974 to change subsection (a) to read, "... to make a study concerning the child, his family, and his environment, and other matters relevant to the disposition of the case and submit the report to the court in writing." Maryland Code, § 3-827 of the Courts and Judicial Proceedings Article (1974).

■ The language concerning the production of a written report inserted into the statute through the 1974 amendments required subsequent revisions to the statute concerning the disposition of such evidence at various types of hearings within Maryland's juvenile justice system. Chapter 554 of the Maryland Laws of 1975 removed the language concerning a probation officer from subsection (a), and replaced it with "the Juvenile Services Administration," as well as inserting the following:

The report of the study is admissible as evidence at a waiver hearing and at a disposition hearing, but not at an adjudicatory hearing. However, the attorney for each party has the right to inspect the report prior to its presentation to the

court, to challenge or impeach its findings, and to present appropriate evidence with respect to it.

Maryland Code, § 3–818(a) of the Courts and Judicial Proceedings Article (1974, 1975 Supp.). Subsequently, this language concerning the admissibility in evidence of the report of a study conducted pursuant to Section 3–818 was moved from subsection (a) to a separate provision at subsection (c).[7] *See* 1982 Md. Laws, ch. 844. Throughout its numerous revisions, the statute continued to provide that independent medical examinations may be conducted on a child, parent, guardian, or custodian identified with a cause of action in the juvenile court.

Section 3–818(a) authorizes the court to direct the Department of Juvenile Justice, or in the case at bar, the DHHS to "make a study . . . relevant to the disposition of the case." The statute does not vest the State with the sole authority to conduct an investigation; rather it leaves the question of whether a study should be conducted up to the court's discretion. *See* § 3–818(a). The only limitation placed on who may perform independent medical examinations, which may be a part of the study, is that those persons be professionally qualified to conduct such examinations. *See* § 3–818(b).

Because Section 3–818 does not specifically exclude parties other than the State in juvenile court actions from seeking an independent medical examination of the child, we turn to the purposes of the juvenile causes statute to ascertain whether such examinations would be consistent with the legislative framework for juvenile causes. With regard to children who are determined to be children in need of assistance, the legislature has empowered the juvenile justice system "[t]o provide for the care, protection and wholesome mental and physical development of children . . . and to provide for a

---

7. Section 3–818(c) operates as a limited exception to the hearsay rule concerning the admissibility of the report itself at certain hearings; however, the report would not be admissible automatically in evidence at a hearing on the termination of parental rights. *See In re Adoption/Guardianship No. 95195062,* 116 Md.App. 443, 465, 696 A.2d 1102, 1112 (1997).

program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest." Maryland Code, § 3–802(a)(4) of the Courts and Judicial Proceedings Article (1974, 1998 Repl.Vol.). We have explained that an individual's interest in raising his or her own child "is so fundamental ... it may not be taken away unless clearly justified." *In re Adoption No. 10941*, 335 Md. at 112, 642 A.2d at 208. Thus, the statute attempts "[t]o conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety." Code, § 3–802(a)(5) of the Courts and Judicial Proceedings Article.

 In keeping with the goals of protecting children in need of the court's assistance and acting in the child's best interests while not unjustifiably infringing on the parent's interest in raising the child, Section 3–818 does not restrict the court from hearing a motion from an interested party to the action requesting an independent medical examination of the child. While it is the role of the parties's advocates, not the juvenile court, to develop the factual record in the case before it, Section 3–818 allows the court the flexibility to grant an order for an independent medical examination of the child. The question remains, however, as to the appropriate procedure to be followed by an interested party who requests an examination pursuant to Section 3–818.

In the context of civil cases, the burden rests with the party requesting the examination to show good cause why the motion for a mental or physical examination should be granted and to provide notice to the person to be examined as well as to the other parties involved in the litigation.[8] *See* Md. Rule

---

8. There are no Maryland Rules governing independent medical examinations of victims in criminal prosecutions, which is analogous to the situation of an abused child in a CINA proceeding. In criminal cases involving independent medical examinations of a child victim of sexual assault or abuse, the courts of other jurisdictions require a higher standard of proof before granting a request for an examination, such that the person or entity seeking the examination bears the burden of demonstrating to the court a compelling need or reason for the exami-

2–423; *Turner v. Whisted,* 327 Md. 106, 113–14, 607 A.2d 935, 939 (1992)(considering the privacy interests of the birth mother and her husband and the interests of the man seeking a paternity determination by a motion for a blood test of the child); *Miles v. Stovall,* 132 Md.App. 71, 82–83, 750 A.2d 729, 735 (2000) (explaining that the court must exercise its discretion in determining whether the party seeking a blood test for paternity made a showing of good cause, and must consider the best interests of the child).

Noting that protection of the child is a paramount concern in CINA actions, we hold that motions for independent medical examinations may be made by a parent or other party in a CINA proceeding, in addition to the state. We also hold that when making a motion to compel a physical or mental examination of a child pursuant to Section 3–818 of the Courts and Judicial Proceedings Article, the party making the motion must demonstrate good cause for such an examination. The examination should be reasonably calculated to assist the trier of fact in rendering its decision. *See Tolen v. State,* 59 Md.App. 625, 639, 477 A.2d 797, 805, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984)(upholding the trial court's decision to refuse to order that a rape victim undergo a subsequent physical examination to test her blood for the presence of alcohol or drugs as the request came months after the alleged incident and "would have been utterly irrelevant" as to the

---

nation. *See e.g., Lanton v. State,* 456 So.2d 873, 874 (Ala.Crim.App. 1984), *cert. denied,* 471 U.S. 1095, 105 S.Ct. 2314, 85 L.Ed.2d 834 (1985)(explaining that physical examinations of child victims may be ordered only in situations of "extreme necessity"); *State v. Garrett,* 384 N.W.2d 617, 619 (Minn.Ct.App.1986)(requiring that criminal defendants show a compelling or substantial need for the examination); *State v. D.R.H.,* 127 N.J. 249, 604 A.2d 89, 95 (1992)(holding that the defendant's need for the examination must "clearly outweigh" the potential harm to the victim); *State v. Ramos,* 553 A.2d 1059, 1062 (R.I.1989)(reasoning that the trial court need only exercise its discretion to order a physical examination in the "most compelling of circumstances"). The court balances the protection of the child against the needs of the defendant in presenting a defense. *See State v. Nguyen,* 52 Conn.App. 85, 726 A.2d 119, 125(1999), *aff'd,* 253 Conn. 639, 756 A.2d 833 (2000).

issue of the victim's potential intoxication at the time of the alleged criminal conduct).

The party also must show that the proposed examination will not be harmful to the child. *See In re John M.*, 129 Md.App. 165, 741 A.2d 503 (1999). In *John M.*, the Court of Special Appeals upheld a juvenile court's decision to deny John M's motion to compel the examinations of his two young female cousins whom he had allegedly sexually assaulted. *See id.* at 191, 741 A.2d at 517. In reaching this decision, the juvenile court stated:

> I regard that there is a danger that exists, that a new therapist, a different therapist, probing into the areas of what happened to these little girls, potentially and unintentionally could upset the current therapy. And after all, money aside, rehabilitation of the Respondent aside, it seems to me that we should not in any way, inhibit, obstruct or destroy the ongoing therapy that these children are in.
>
> * * *
>
> And I, I have a great concern, that in the course of probing, into the issues, uh ... in this case, a therapist could unintentionally disturb the current therapy, or upset the child. And obviously these are areas, when you're involved in the sexual abuse of a five and six year old child, which these children currently are, it's a very delicate situation. And it involves the rest of their lives.

*Id.* at 190, 741 A.2d at 517.

In the matter before us, Dr. Lazun, Mark M.'s therapist, testified at the October 1, 1999 hearing and expressed a serious concern regarding Mark M.'s fragile mental state and his ability to interact with his mother. He described incidents during Mark M.'s treatment where Mark M. expressed his fear and anger towards his mother, and testified that if Mark M. were to have to see his mother at that time it would cause a regression in his treatment and thwart the progress that had been made in Mark M.'s therapy. Counsel for Helen M. made an oral motion at this hearing to have Mark M. evaluated by a qualified child psychologist, not affiliated with DHHS, to

explore whether his mother could visit Mark M. The juvenile court denied the independent medical examination of Mark M. based solely on the evaluations provided by Dr. Lazun and DHHS.

As a result, the mother did not have any ability to challenge the purported findings of Dr. Lazun. On the other hand, Helen M. did not provide the court with the name and credentials of the therapist whom she would employ to conduct the independent medical examination of Mark M., and she did not provide any means to assure that such an examination would not be harmful to Mark M.

We agree with the Court of Special Appeals that in her oral motion, Helen M. had failed to make a proper showing of a need for an independent medical examination of Mark M. We find, therefore, that the juvenile court did not abuse its discretion in denying Helen M.'s request for an independent medical examination of Mark M.

Upon remand, Helen M., should have the opportunity to advocate for an independent medical examination if she so chooses, but must provide the data specified, and the court must balance the protection of Mark M. against Helen M.'s needs for the examination. The juvenile court must be specific in its decision to either grant or deny the motion for an independent medical examination of the child.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE DISTRICT COURT OF MARYLAND, JUVENILE DIVISION, AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*