812 A.2d 271

In re ADOPTION/GUARDIANSHIP NO. 6Z000045 In the Sixth District Court of Maryland, Montgomery County Sitting as a Juvenile Court.

No. 18, Sept. Term 2002.

Court of Appeals of Maryland.

Dec. 10, 2002.

Mary J. Pizzo, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., Eldridge, Raker, Wilner, Cathell, Harrell, and Battaglia, JJ.

BATTAGLIA, Judge.

Kim Lee H. (hereinafter "Ms. H.") challenges two holdings of the Court of Special Appeals that effectively terminated her parental rights with respect to her daughter, Nakera.[1]  Ms. H

---

1.  Various documents in the record refer to the child as "Nakyra."  For the sake of consistency, however, we will refer to her as "Nakera," the name used by Ms. H. in her petition for Writ of Certiorari and brief to this Court.

challenges the intermediate appellate court's decision that the trial court, in a Termination of Parental Rights (hereinafter "TPR") proceeding, did not err in refusing to withdraw its order waiving the parental notice requirement under Maryland Code, § 5-322 of the Family Law Article (1984, 1999 Repl.Vol.), after the court had learned Ms. H. objected to the termination of her parental rights. Secondly, Ms. H. contests the Court of Special Appeals's conclusion that the trial court correctly determined that there was no requirement to notify of the TPR proceeding the attorney who formerly represented Ms. H. during a prior Child in Need of Assistance (hereinafter "CINA") proceeding. Because we find that the trial court erred with regard to both issues, we reverse the decision of the Court of Special Appeals.

## I. Background

On August 23, 1997, Ms. H. gave birth to a daughter, Nakera. Although some uncertainty had existed about the identity of Nakera's father, paternity proceedings eventually established that Lawoe N. (hereinafter "Mr. N") was the biological father. During the better part of Nakera's first two years, Ms. H. maintained physical custody of her daughter, but did not keep a regular place of residence.

On May 20, 1999, Ms. H. reported to the Montgomery County Police that Nakera sustained an injury at the hands of Ms. H's companion. The Montgomery County Police and Child Welfare Services of the Montgomery County Department of Health and Human Services (hereinafter the "Department") investigated the report. In the course of the investigation, the Department learned that Ms. H. was homeless, that she was unwilling to stay in a shelter, and that Nakera suffered from Sickle Cell Anemia. Based on this information, the Department removed Nakera from her mother's care on August 20, 1999.

At the direction of the Department, Nakera resided briefly in the home of her maternal aunt. Thereafter, Nakera was placed with her maternal grandmother before eventually moving into the home of a licensed foster parent. On October 27,

1999, the Department placed Nakera with Ms. H.'s half sister, Valerie L. Nakera remained there until March 3, 2000 when the Department again placed her with the licensed foster parent. Soon after this last placement, the District Court of Maryland, sitting in Montgomery County, in its capacity as Juvenile Court (hereinafter the "Juvenile Court"), on March 13, 2000, adjudicated Nakera a CINA. Ms. H. did not attend the CINA adjudication.

After being separated from Nakera, Ms. H. apparently disappeared. According to the Department's April 6, 2000 status report to the Juvenile Court, the Department had no record of Ms. H.'s whereabouts since October 29, 1999. The report also indicated that Ms. H. and the Department communicated on only a few occasions between October 29, 1999 and April 3, 2000. The first of these communications occurred on October 29, 1999 when Ms. H. arrived at the Department without an appointment. During a meeting with a social worker at that time, Ms. H. expressed her desire to be reunified with her daughter but, according to the report, refused to provide an address or telephone number to the Department. The other communications did not take place until after the CINA adjudication, almost five months later. On March 16, 2000, Ms. H. contacted the Department by phone and arranged to meet, in person, with a social worker on March 20, 2000. Ms. H. explained, during the phone conversation, that she would give the social worker her contact information at the scheduled meeting. The meeting, however, never took place because Ms. H. called the Department on March 20 and cancelled.

Although Ms. H. did not attend the CINA proceedings, she did receive legal representation during the period between August 1999 and April 2000 from attorney Leah Darring (hereinafter "Ms. Darring")of the Office of the Public Defender. On August 26, 1999, Ms. Darring entered her appearance on behalf of Ms. H. On that day, she filed a Request for Discovery in response to the Department's Shelter Care Petition in which it alleged Nakera was a CINA. On January 4, 2000, Ms. Darring filed a motion to strike her appearance

from the case. On January 10, she filed a request for an order of discovery in Nakera's CINA case. On March 20, 2000, Ms. Darring arrived at the Department to attend the meeting with the social worker that Ms. H. had arranged but later cancelled. On April 13, 2000, exactly one month after Nakera had been adjudicated a CINA, the Juvenile Court granted Ms. Darring's motion to strike her appearance.

After Nakera spent several more months in foster care, the Department, on December 4, 2000, filed a petition for guardianship, which if granted, would terminate the parental rights of Nakera's biological father and mother. The Juvenile Court then, on the same day, issued show cause orders for Nakera's parents and ordered the Department to serve the orders upon the parents. The court issued the show cause orders pursuant to Maryland Code, § 5–322(b) of the Family Law Article (1984, 1999 Repl.Vol.), to inform Nakera's parents that the Department was seeking to terminate their parental rights and that they had the right to object to the proceedings.[2] The show cause order stated that, upon receipt of the order, the parents had thirty days within which to object to the Department's petition.

In compliance with the court's order, the Department, to no avail, made several efforts to contact Ms. H. On March 26, 2001, the Department filed a Motion to Waive Notice to Ms. H., on the ground that it could not locate her to serve the show cause order. In support of the motion, the Department filed an affidavit detailing its efforts to locate and contact Ms. H. throughout the previous months. The Department attempted unsuccessfully to telephone Ms. H. at two numbers that Ms. H., at one time, had indicated were her places of employment. Attempting to obtain contact information, the Department checked with other Montgomery County human service agencies, the Maryland State Department of Correc-

---

2. The court issued the show cause orders in the form required by Maryland Rule 9–105(h) (2000). Under Rule 9–105(h), the contents of the show cause order must explain the nature of the proceeding, inform the natural parents of their right to object, and indicate the consequences to the parents of failing to object within the stated time limit.

tions, the Montgomery County Detention Center, Nakera's father, the Juvenile Court, Valerie L., Ms. H.'s step-grand-mother, and the telephone directories for Montgomery County and the District of Columbia. None of these sources provided the Department with useful information about Ms. H.'s where-abouts.

The Department's affidavit also reflected the efforts of its private process server in trying to locate Ms. H. The private process server had attempted to serve Ms. H. at the address on file with the Maryland Motor Vehicle Administration. He had no success. Next, he obtained a forwarding address from the post office, to which he sent a Notice to Serve Court Papers by certified mail. On the mailing, the private process server hand wrote a note that stated: "Kim: Nakera [] is being placed into permanent guardianship—Your parental rights are being terminated. You have a right to object to this. Please call and leave a message [with] phone [number]. I need to speak with you about [the] case." That mailing was returned by the post office and marked, "Moved Left No Address." The Juvenile Court, however, did not grant the Motion to Waive Notice because more than ninety days had passed since the show cause order had been issued. Pursuant to Maryland Rule 9 105(d), the Juvenile Court renewed the show cause order on March 29, 2001.

On April 12, 2001, the Department filed a supplement to its affidavit, which explained that the Department had had recent contact with Ms. H. The affidavit also discussed why it was unable to serve her, despite this recent contact. The Juvenile Court granted the Department's Motion to Waive Notice on April 18, 2001. Next, the Department filed a Motion for Final Order on April 25, 2001 to obtain guardianship of Nakera and terminate the parental rights of her parents. At no time during the above sequence of events did the Department or the Juvenile Court provide notice or attempt to provide notice of the guardianship petition to the attorney that represented Ms. H. during Nakera's CINA proceedings.

On May 4, 2001, Ms. H. filed a notice of objection to the Department's petition for guardianship of Nakera. Five days later, after obtaining legal counsel, Ms. H. filed an opposition to the Department's Motion for Final Order.

With opposing motions before it, the court conducted a hearing on June 5, 2001 to decide whether to enter the final order granting the Department guardianship of Nakera. At the hearing, the court took proffers from opposing counsel and heard the testimony of Ms. H., and two others, Raynelle Miller (hereinafter "Ms. Miller"), a social worker with the Department and, Linda Lu (hereinafter "Ms. Lu"), an administrator in the clerk's office of the Juvenile Court.[3] The testimony offered at the hearing presented different versions of Ms. H.'s contact with the Department and Juvenile Court during the weeks immediately preceding the court's waiver of notice on April, 18, 2001.

Ms. H. gave her version of the events first. She testified that she first learned of the TPR proceeding on a Saturday in late March or early April, 2001 when she received a call from Valerie L., her half sister with whom Nakera lived. Valerie L. stated during that conversation that Mr. N. had been requesting to visit Nakera. According to Ms. H.'s testimony, she then, that same day, called Ms. Miller, Nakera's adoption coordinator at the Department, from whom she learned that Valerie L. was attempting to adopt Nakera. Ms. H. also learned from Ms. Miller that the proceedings involving Nakera were already "in the adoption phase." Ms. Miller, however, never asked Ms. H. for her address or telephone number, told her about a show cause order, or told her of her right to object to the TPR proceedings. Instead, Ms. Miller suggested that Ms. H. contact the Clerk's office with her questions or concerns.

Ms. H. testified that she followed the advice of Ms. Miller and called the Clerk's office the next business day. Initially,

---

**3.** Mr. N also testified at the hearing, but his testimony is not relevant to the issues in this appeal. Mr. N. did not petition this Court for a writ of certiorari.

she talked to Mrs. Riggs from the Clerk's office who told her that Nakera's case was closed and, when Ms. H. asked her to check again, Mrs. Riggs told her to talk to either "Rosina," an assistant from the Office of the Public Defender or to Ms. Lu., an administrator in the Clerk's Office. Ms. H. first called Rosina, who claimed to have no knowledge of Nakera's case. Ms. H. then called Ms. Lu. According to Ms. H., Ms. Lu refused to give her any assistance unless Ms. H. personally visited the Clerk's office. Ms. H. also testified that Ms. Lu never asked for Ms. H.'s address or telephone number.

Ms. H., two days later, made a trip to the Clerk's office to find out what was happening with her daughter's case. There, she encountered Mrs. Riggs, who referred her to Ms. Lu. Ms. H. explained to Ms. Lu that she wanted information about court dates for Nakera's case. Ms. Lu responded, "[H]old on one second, I'll get the file." Ms. H. stated in her testimony that she waited for Ms. Lu to return for "about a half hour to forty minutes" before finally leaving. Just before she left, Ms. H. asked Mrs. Riggs one last time whether she had any information about court dates involving Nakera. Mrs. Riggs did not know of any court dates, and Ms. H. left the office without having been asked for her telephone number or address.

The testimony of the two witnesses called by the Department differed from Ms. H.'s. Ms. Miller testified that Ms. H. called her on March 19, 2001 to discuss Nakera's adoption proceedings. Contrary to Ms. H.'s testimony, however, Ms. Miller stated that she asked for a telephone number and address where Ms. H. could be reached, but Ms. H. refused to give the information. Ms. Miller also testified that she advised Ms. H. to contact an attorney so that Ms. H. could be represented at "any meeting" involving Nakera's adoption. When Ms. H. suggested a meeting with Ms. Miller, however, Ms. Miller refused because she believed attorneys should be present. According to Ms. Miller, on March 21, 2001, Ms. H. called her again about Nakera's case and did not give an address or phone number where she could be contacted. Ms. Miller's testimony, however, does not indicate that she told

Ms. H why the telephone number and address were needed, about the consequences of the TPR proceedings, or that Ms. H. had a right to object to the TPR.

Ms. Lu then testified about her interaction with Ms. H, which she stated involved two phone conversations and two meetings in person. Ms. Lu testified that her first contact with Ms. H. occurred in March when Ms. H. called to find out court dates for Nakera's adoption proceeding. Ms. Lu stated that she asked Ms. H. for her address, but Ms. H. refused to provide it. Later, according to Ms. Lu, Ms. H. visited the clerk's office and asked for information about court dates. Ms. Lu asked Ms. H. to "wait" while she "f[ound] out some information to tell her." Her search for information involved locating the judge of the Juvenile Court to obtain his signature on the show cause order, which had just been reissued that day, March 29, 2001. When Ms. Lu returned to the clerk's office—in five or ten minutes according to Ms. Lu—Ms. H. was no longer there. Ms. Lu then testified that she spoke to Ms. H. on the phone on one other occasion and unsuccessfully requested an address and telephone number. Ms. Lu never told Ms. H. why she wanted her address and telephone number and never mentioned to Ms. H. anything about the show cause order, nor did she tell Ms. H. about her right to object to the TPR proceedings.

After hearing the testimony, the Juvenile Court found:

I believe that the mother's refusal to provide her address overcomes any problem in the fact that the petition was not sent to prior counsel. It is the mother's refusal to provide the Court the information on her address which I think has resulted in her not being served. And, in fact, in the Court's article—

In 3–837 of the Courts article, it says each parent of a child who is the subject of a Child in Need of Assistance proceeding shall notify the Juvenile Court and the Department of Social Services of all changes in the parent's address. This, from the evidence I've heard today, did not occur, and I find that the mother has, by her refusal to answer a direct

question about her address which would have permitted service, or her compliance with the request of the court clerk to remain, she could have been served. It was her direct efforts which resulted in her not being served.

I think the Motion to Waive Service was properly entered and a Motion for Final Order as to her mother should be and will be entered.

On the same day of the hearing, June 5, 2001, the Juvenile Court issued an order, granting guardianship of Nakera to the Department and terminating Ms. H.'s parental rights.

On appeal, the Court of Special Appeals upheld the Juvenile Court's rulings regarding both questions that Ms. H. has presented to this Court. The intermediate appellate court, in an unreported opinion, found that competent evidence in the record supported the Juvenile Court's implicit factual findings that the Department had requested an address and phone number from Ms. H. It held, therefore, that the Juvenile Court reasonably concluded that Ms. H.'s actions (i.e., refusal to provide an address and telephone number and failure to wait for Ms. Lu to return from seeking information about Nakera's case) directly contributed to her failure to be served. The court also held that the Department was not required to provide notice to Ms. H.'s former attorney because that attorney had stricken her appearance prior to the filing of the TPR petition and no longer had a duty to act on behalf of Ms. H. Ms. H's petition for writ of certiorari in this Court followed.

We granted Ms. H.'s petition, *In re: Adoption/Guardianship No. 6Z000045*, 369 Md. 178, 798 A.2d 551 (May 8, 2002), to answer the following two questions, which we have rephrased for clarity:

A.  Did the trial court err in terminating Ms. H.'s parental rights based on its finding that Ms. H. was responsible for the Department's failure to notify her of the TPR proceedings?

B.  Did the trial court err in determining that there was no requirement of notice to the attorney who represented Ms. H. in a prior Child in Need of Assistance proceed-

ing, as required by Family Law Article § 5–322, where the attorney had stricken her appearance prior to the filing of the petition for guardianship?

Upon examining the record and the relevant statutory provisions requiring certain notice before terminating a parent's rights, we answer both questions in the affirmative.

## II. Discussion

### A. Waiver of Notice in TPR Proceeding

A parent possesses a constitutionally protected fundamental right to raise his or her child. This Court's most recent recognition of this principle appeared in *In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 671, 796 A.2d 778, 780–81 (2002), in which we recited our discussion of parental rights in *In re Mark M.*, 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001):

A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000) (stating that 'the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children'); *See also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing 'the fundamental liberty interest of natural parents in the care, custody, and management of their child'); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (stating that '[t]he rights to conceive and to raise one's children have been deemed "essential," ' and that 'the integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment ... " (internal citations omitted)). Maryland, too, has declared a parent's interest in raising a

child to be so fundamental that it 'cannot be taken away unless clearly justified.' *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998) (citing *In re Adoption No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994)).

This fundamental liberty interest is also deeply rooted in numerous Supreme Court decisions, which describe the constitutional due process protections afforded to a parent when the State attempts to abrogate parental rights. *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Santosky,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

We described these protections in *In re Adoption/Guardianship No. 93321055,* 344 Md. 458, 687 A.2d 681 (1997):

> *Lassiter, Santosky,* and their progeny recognize three basic principles: (1) parents have a fundamental liberty interest in the care, custody, and management of their children, (2) when the State moves to abrogate that interest, it must provide the parents with fundamentally fair procedures, and (3) the process due to parents in that circumstance turns on a balancing of the three factors specified in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), *i.e.,* the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting the use of the challenged procedure.

344 Md. at 491, 687 A.2d at 697.

In the case *sub judice,* we must analyze whether Ms. H.'s due process rights were abrogated when the Juvenile Court applied Maryland Code, § 5–300 *et seq.* of the Family Law Article (1984, 1999 Repl.Vol.) to terminate her parental rights.[4]

---

4. Because the trial court entered the TPR order on June 5, 2001, we apply the statute as it existed at that time. Effective October 1, 2001, the General Assembly amended the relevant provisions of section 5–322 to allow the court, in a TPR proceeding, to waive notice only after the Department has attempted to notify parents of their right to object by

Section 5–322(b) defines the notice requirements in guardianship cases where the child has been adjudicated a CINA. The statute provides in part:

> If a petition for guardianship is filed after a juvenile proceeding in which the child has been adjudicated to be a child in need of assistance, the petitioner shall give notice to the child's natural parent by serving a show cause order by certified mail or private process on the natural parent[.]

Code, § 5–322(b) of the Family Law Article.

Section 5–322(c)(3) provides, however, that the notice requirement shall be waived under certain circumstances. That section states:

> If the child has been adjudicated to be a child in need of assistance in a prior juvenile proceeding, and the court is satisfied by affidavit or testimony that the petitioner has made reasonable good faith efforts to serve by both certified mail and private process one show cause order on the parent at the addresses specified in subsection (b) of this section, but was not successful, the court shall waive the requirement of notice to the natural parent.

Code, § 5–322(c)(3) of the Family Law Article.

"Subsection (b)" in the above passage refers to Section 5–322(b). That section provides that, if the parent did not attend the CINA adjudication, like in the present case,[5] the petitioner is required to serve the parent: (1) at the latest address, if any, listed in the records of the Juvenile Court, and (2) at any other address for the parent "identified after

---

publication in a newspaper of general circulation. Maryland Code, § 5–322(c)–(d) of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.). Our decision in this case, however, rests only on the provisions of the law as they existed in June, 2001.

**5.** References in the record suggest that Ms. H.'s attorney of record at the time, Ms. Darring, may have attended the CINA adjudication. Nevertheless, for the purposes of Section 5–322, Ms. Darring's attendance is not equivalent to the presence of Ms. H., the natural parent. Section 5–322(b) speaks only of the "natural parent" and does not refer to the "attorney who represented a natural parent," as does Section 5–322(a) discussed *infra* in Part B of this opinion.

reasonable good faith efforts to locate the parent." Code, § 5–322(b)(2)(i)–(ii) of the Family Law Article. The petitioner for guardianship of a CINA, therefore, may be relieved of its burden to actually notify a parent who did not attend the CINA adjudication, only if the petitioner satisfies the court that it made reasonable good faith efforts to locate that parent.

When the court waives the notice requirement under Section 5–322(c)(3), the statute further provides that the waiver serves as the parent's "deemed consent" to the petition for guardianship. This deemed consent arises under the operation of Section 5–322(d)(1)–(2), which provides in relevant part:

> (d) If ... a person's notification has been waived under subsection (c) of this Section:
>
> (1) the court shall consider the person ... whose notice is waived to have consented to the ... guardianship; and
> (2) the petition shall be treated in the same manner as a petition to which consent has been given.

Code, § 5–322(d)(1)–(2) of the Family Law Article.

■ The parties do not question whether, by order of April 18, 2001, the Juvenile Court properly waived the notice requirement under the statute. Ms. H., however, argues that the Juvenile Court deprived her of due process by refusing to withdraw its order waiving notice after the court had knowledge that Ms. H. was available and wished to contest the TPR. We agree.

In *In re Adoption/Guardianship No. 93321055* (*"Adoption 1055"*), we addressed the due process implications of a parent's deemed consent arising under Section 5–322. 344 Md. at 491–94, 687 A.2d at 697–98. We determined that there was no facial due process defect in the statutory scheme under Section 5–322(d), in which a parent's irrevocable deemed consent arises when the parent fails to object timely to a TPR proceeding after receiving a show cause order. *Id.* at 494, 687 A.2d at 698. In coming to this conclusion, we followed the Supreme Court's approach for determining the constitutionality of a procedure that leads to the loss of a fundamental right.

That approach involved the balancing of three factors that the Supreme Court specified in *Mathews:* (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting the use of the challenged procedure. *Id.* at 491, 687 A.2d at 697 (citing *Mathews,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18). We weighed the *Mathews* factors as follows:

> The first and third *Mathews* factors are obviously important ones in a termination of parental rights action. The private interest is the parent's fundamental right to raise his or her children, and there are few, if any, rights more basic than that one. The governmental interest in securing permanent homes for children placed into its custody because of an inability or unwillingness of their parents to care for them properly is also strong and vital, however. These are vulnerable and defenseless children, usually at critical stages of their development and having only the government and its agents to turn to for physical and emotional sustenance. Once it appears that reunification with their parents is not possible or in their best interest, the government has not only a special interest, but an urgent duty, to obtain a nurturing and permanent placement for them, so they do not continue to drift alone and unattached.

*Id.* at 491–92, 687 A.2d at 697 (footnote omitted).

Of the second *Mathews* factor, we found that "the risk of error in establishing an absolute deadline for filing a notice of objection is relatively small." *Id.* at 494, 687 A.2d at 698. Our analysis of the second *Mathews* factor in *Adoption 1055,* however, relied on the procedural due process protections afforded by the parent's actual receipt of a show cause order. We stated:

> The statutory deemed consent does not exist in a vacuum. It arises *only after service on the parent of a show cause order* that explains, in plain, simple language, the right to object, how, where, and when to file a notice of objection, and the consequence of not filing one within the time allowed. A form notice of objection is attached to the order,

and all that the parent need do is to sign it, print on it his or her name, address, and telephone number, and mail or deliver it to the address shown in the order. If ... the children have already been declared to be CINA, a copy of the order is also served on the attorney who represented the parent at the CINA proceeding.

*Id.* at 493, 687 A.2d at 698 (emphasis added). Upon balancing the three *Mathews* factors, we concluded that "in the normal case and in the cases now before us, the parent is given fair and adequate notice of what is required and a fair and adequate opportunity to file a timely notice of objection." *Id.* at 494, 687 A.2d at 698.

■ We find it important to note, at this point, that the procedure contemplated in *Adoption 1055* is far different from what occurred in the instant case. The parents' deemed consent in *Adoption 1055* arose when they failed to object to the TPR proceedings despite receiving actual notice of those proceedings by show cause order. Conversely, Ms. H. never received a show cause order. Her deemed consent arose, instead, when the Juvenile Court, under Sections 5–322(c)(3) and 5–322(d), waived the notice requirement after it was satisfied that the Department could not locate her. A parent whose consent was deemed as a result of a waiver of the notice requirement obviously does not receive the due process protections provided by receiving actual notice of the proceeding. In a situation such as this, where a petitioner has moved to waive the notice requirement, it is imperative, therefore, for the court to rigorously scrutinize whether the petitioner, under Section 5–322(b)(2)(ii), made "reasonable good faith efforts to locate the parent."

On April 18, 2001, when the Juvenile Court initially waived the notice requirement to Ms. H., the court had before it only the various affidavits filed by the Department, which recounted the unsuccessful efforts to locate and serve Ms. H. At that point, the Juvenile Court did not know the details of Ms. H.'s recent persistent efforts to learn about and become involved in Nakera's case. The Juvenile Court, however, opted to recon-

sider its initial decision to waive the notice requirement when, at the June 5, 2001 hearing, it heard testimony regarding Ms. H.'s recent contact with the Department. Based on that testimony, the Juvenile Court refused to withdraw its waiver of the parental notice requirement. The court issued its findings orally at the hearing:

> I find that the mother has, by her refusal to answer a direct question about her address which would have permitted service, or her compliance with the request of the court clerk to remain, she could have been served. It was her direct efforts which resulted in her not being served.

These findings erroneously focused on Ms. H.'s "efforts" rather than the Department's "reasonable good faith efforts," which is the statutory standard for waiving the notice requirement.[6] The court's failure to consider the role that the Department and Juvenile Court clerk played in preventing Ms. H. from being properly notified of the TPR resulted in the termination of her fundament right to parenting without due process. We explain.

Our examination of the record leads us to conclude that the Department did not make sufficient reasonable good faith efforts, under all of the circumstances present here, to locate Ms. H.[7] The record provides evidence that the Department

---

**6.** The evidence in the record does not support the Juvenile Court's finding that "Ms. H.'s direct efforts ... resulted in her not being served." The record contains no evidence that Ms. H. knew of the TPR proceedings before she spoke with Valerie L. in late March, 2001. The affidavits filed by the Department and the testimony offered at the hearing support Ms. H.'s testimony that she never received notice of the TPR proceeding. Furthermore, the testimony of Ms. Lu and Ms. Miller indicated that, soon after Ms. H. learned of the proceedings, she sought, by phone and in person, information about the proceedings. It is clear from the evidence on the record that Ms. H. initiated all of this contact and even suggested to Ms. Miller that they meet to discuss Nakera's situation.

**7.** Because the Department failed to make sufficient reasonable good faith efforts to locate Ms. H., we need not decide in this case whether a trial court is required to permit a parent to be heard on a TPR petition in any case where the Department has made reasonable good faith efforts to locate the natural parent.

and the Juvenile Court Clerk's office shared responsibility for the failure to notify, in fact, Nakera's mother of the TPR proceeding. In all of Ms. H.'s contact with the Department and with the Juvenile Court Clerk's office, she was never informed that the consequence of refusing to give her address could be the termination of her parental rights. Ms. Miller and Ms. Lu testified that they never mentioned to Ms. H. that she could object on the show cause order or that a show cause order even existed.[8] Despite repeatedly asking for "court dates" related to Nakera's adoption, Ms. H. never was given information about the exact status of Nakera's court proceedings, her participation in which could have prevented the loss of her parental rights. When the Department fails to make clear the steps that Ms. H. needed to take to preserve her parental rights, given the telephone and face-to-face opportunities to do so in a timely fashion, we cannot then expect her to understand the consequences of failing to take those steps. To deprive Ms. H. summarily of her parental rights without a trial on the merits when the Department and the Juvenile Court share, at least, some of the responsibility for Ms. H. not receiving proper notice of the guardianship petition would be to deny without due process Ms. H.'s fundamental right to parent.[9]

---

**8.** Although the original show cause order of December 4, 2000 had expired prior to Ms. H.'s contact with the Department, there is no doubt that Ms. H. could have asserted her right to object effectively prior to the Juvenile Court's order waiving notice on April 18, 2001.

**9.** The Court of Special Appeals and the Juvenile Court cited former Section 3–837 of the Courts Article, which imposes an obligation on parents whose children have been adjudicated CINA to keep the court informed of their current address. Maryland Code, Section 3–837 of the Courts Article (1973, 1998 Repl.Vol.) (codified presently under Section 3–822 of the Courts Article (1973, 2002 Repl.Vol.). The courts' analysis, however, overlooks the Juvenile Court's duty under former Section 3–837.1 of the Courts Article to inform the parents of the obligation to keep the court apprised of their current address. Maryland Code, Section 3–837.1 of the Courts Article (1973, 1998 Repl.Vol.) (codified presently under Section 8–322 of the Courts Article) (1973, 2002 Repl.Vol.). In this case, the Juvenile Court never informed Ms. H. of her obligation under Section 3–837 of the Courts Article because she did not attend the CINA adjudication. Furthermore, even if Ms. H.

## B. Notice to Former Attorney

■ The second question presented by Ms. H. concerns the attorney notification requirement under Section 5–322 of the Family Law Article and under Maryland Rule 9–105. The statute provides, in pertinent part:

[I]f a petition for guardianship is filed after a juvenile proceeding in which the child has been adjudicated to be a child in need of assistance ... a petitioner shall give notice of the filing of the petition for guardianship to:

1.  the attorney who represented a natural parent in the juvenile proceeding;....

Code, § 5–322(a)(1)(ii)(1) of the Family Law Article. Rule 9 105, governing notice in guardianship cases, addresses this same requirement. It provides, in relevant part:

The petitioner in an action for guardianship of a child who has been adjudicated a child in need of assistance in a prior juvenile proceeding shall also send a copy of the petition and show cause order by first class mail to each attorney who represented a parent and to the attorney who represented the child in the juvenile proceeding.

Md. Rule 9–105(f) (2001).[10]

Recently, in *Beyer v. Morgan State University*, 369 Md. 335, 800 A.2d 707 (2002), we discussed our central focus in determining the interpretation of statutory language and the Maryland Rules:

The principal goal of statutory interpretation is to ascertain the legislative intent behind the enactment. The statutory

knew of this obligation, the consequence for any failure to provide this address pursuant to this provision should not be the loss of her fundamental right to parenting. The Legislature enacted Section 3-837 of the Courts Article to expedite the process of terminating parents' rights. 1995 Md. Laws ch. 177; Senate Judicial Proceedings Committee, Floor Report of Senate Bill 521 (1995). Section 3-837, however, was not enacted *for the purpose* of terminating parental rights.

10.  This citation represents the Rule that was in force when the Juvenile Court entered the final TPR order. The current version of Maryland Rule 9–105(f) retains the exact language of the version quoted.

language serves as the primary source for determining legislative intent. Where the statutory language is clear and unambiguous, our inquiry is at an end.

\* \* \*

These principles applied to statutory interpretation are identical to those used to interpret the Maryland Rules. 369 Md. at 349–50, 800 A.2d at 715 (citations omitted).

When Nakera was adjudicated a CINA on March 13, 2000, Ms. H. had been represented in the juvenile proceeding by an attorney, but the Department failed to notify that attorney of the filing of the petition for guardianship of Nakera. The Department argues that it was not required to notify the attorney because the court had stricken the attorney's appearance before the Department filed its petition for guardianship. The Department reads the statute, rather, to require notice to be given only to an attorney who is the attorney of record for the natural parent. That reading contradicts the plain language of the statute.

The statutory language of Section 5–322(a)(1)(ii)(1) of the Family Law Article refers precisely to a particular attorney, "the attorney who represented a natural parent in the juvenile proceeding." Code, § 5–322(a)(1)(ii)(1) of the Family Law Article. The statute further refers precisely to a particular proceeding, the "juvenile proceeding in which the child has been adjudicated to be a child in need of assistance." Code, § 5–322(a)(1)(ii) of the Family Law Article. Consequently, the statute commands a petitioner for guardianship to provide notice to any attorney who represented the natural parent in the juvenile proceeding. The statute does not qualify this command to exclude attorneys whose appearance was stricken since the CINA adjudication. In this case, Ms. H. received representation from one such attorney, Ms. Darring. On August 26, 1999, Ms. Darring entered her appearance to represent Ms. H. in Nakera's CINA case. Ms. Darring's appearance was not stricken until April 13, 2000, one month after the Juvenile Court adjudicated Nakera to be a CINA.

Ms. Darring, although she withdrew her appearance after Nakera was adjudicated a CINA, was an attorney to which the statute refers, and she should have been given notice of the petition for guardianship.[11]

The language of Rule 9–105 also supports this reading of the statute. Under Rule 9–105, the Department must notify "each attorney who represented a parent" in a juvenile proceeding in which the child has been adjudicated a CINA. Rule 9–105, in referring to "each attorney," acknowledges that a petitioner for guardianship may be required to notify more than one attorney if multiple attorneys represented a parent during the CINA proceedings. Such a requirement, therefore, still commands notice to at least one attorney who represented the parent at the CINA proceeding. Again, the Department in this case was required, under the plain language of both Rule 9–105 and Section 5–322 of the Family Law Article, to notify the attorney who represented Ms. H. when Nakera was adjudicated a CINA. The Department did not fulfill this requirement and, therefore, violated the clear mandate of the statute.

---

11. The Department argues that, because Ms. Darring's appearance in the case had been stricken, she no longer had an obligation to act on behalf of Ms. H. or attempt to find her. That may be true in this case; however, the Department's duty to comply with the plain statutory notice requirement does not depend on whether the former attorney chooses to act on behalf of the former client or, in some way, can assist the Department in finding the parent. Furthermore, the attorney notification requirement does not apply only when a petitioner is certain that the attorney receiving the notice will be able to assist in locating the parent. Rather, a petitioner, in every case in which it seeks guardianship, must notify the CINA attorney to comply with its statutory obligation, under Section 5–322(a)(1)(i), to notify the natural parents of the petition for guardianship.

Once notified, the former attorney, although not obligated to act for the parent, might have information that might assist the petitioner in locating the parent. The former attorney may also be able to personally contact the parent to inform him or her of the nature and consequences of the TPR proceeding. Along with complying with the other statutory methods for reaching the parent, the attorney notification requirement ensures that a petitioner has exhausted all of the means for contacting the parent for which the Legislature provided.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS
REVERSED. CASE REMANDED TO THE COURT OF
SPECIAL APPEALS WITH INSTRUCTIONS TO RE-
VERSE THE JUDGMENT OF THE DISTRICT COURT OF
MARYLAND AND TO REMAND THE CASE TO THE
CIRCUIT COURT FOR MONTGOMERY COUNTY FOR
FURTHER PROCEEDINGS CONSISTENT WITH THIS
OPINION. COSTS IN THIS COURT AND IN THE COURT
OF SPECIAL APPEALS TO BE PAID BY RESPON-
DENT.*

RAKER and WILNER, JJ. concur.

Concurring opinion by WILNER, Judge, in which RAKER,
Judge, joins.

I concur in the judgment, but only because I agree that the
failure of the State to notify petitioner's counsel in the CINA
case, in violation of the clear mandate in Maryland Code, § 5–
322(a) of the Family Law Article and Maryland Rule 9–105(f),
precludes, on this record, an order terminating petitioner's
parental rights. I dissent from the Court's conclusion that
entry of that order deprived petitioner of due process of law.

Although we granted *certiorari* to consider both questions,
it became clear from the briefs and at oral argument that the
issue of due process had lost all *"cert-worthy"* value. That
issue arises solely from the fact that, after finding that (1) the
State made a good faith effort to serve petitioner with the
petition for guardianship and a show cause order explaining
her rights and warning of the consequences of a failure to act,
and (2) by steadfastly refusing to reveal her address and thus
effectively concealing her whereabouts, petitioner essentially
made it impossible to serve her with those documents, the trial
court waived the requirement of notice and then, in full
accordance with the applicable statutes and rules, deemed her
to have consented to the petition. The Court concludes that,
in finding a deemed consent and refusing to permit petitioner
to withdraw that consent and challenge the petition, the trial
judge somehow denied her due process of law.

As the State pointed out, however, a 2001 amendment adopted by the General Assembly no longer permits a waiver of notice under that circumstance but provides, instead, for published notice. *See* 2001 Maryland Laws, ch. 496. The foundation of the Court's ruling, therefore, no longer exists, and its opinion on this subject will have utterly no precedential value with respect to any petition for guardianship filed on or after October 1, 2001. What the Court seems to be doing is declaring unconstitutional a statute that no longer exists. As there is an independent basis for reversing the judgment in this case, there is simply no reason to opine on the due process question presented on this record. The Court reaches out to decide a Constitutional question that it need not decide, either in this case or for guidance in other cases and, in so doing, ignores the long-held rule that we do not decide Constitutional issues when it is not necessary to do so.

The violation of this rather bedrock principle of appellate review and restraint would be bad enough if the ruling were correct; here, it is particularly egregious because the ruling is dead wrong.

I have great difficulty in discerning just how petitioner was denied due process of law, for, although the Court holds that she was, it never explains how she was, other than by looking at the disputed evidence in a light most favorable to her, rather than in a light most favorable to the State, as the Court's own rule and its established case law require it to do. *See* Maryland Rule 8–131(c); *Urban Site v. Levering,* 340 Md. 223, 229–30, 665 A.2d 1062, 1065 (1995); *Colandrea v. Wilde Lake,* 361 Md. 371, 393–94, 761 A.2d 899, 911 (2000).

Nakera was born in August, 1997. She remained with petitioner for the first two years of her life, but as a nomad, for, as the Court points out, petitioner did not keep a "regular place of residence." After investigating a reported injury to the child at the hands of petitioner's then-companion (which I read to be a complaint of child abuse) and learning (1) that petitioner was homeless and unwilling to stay in a shelter, and (2) that Nakera suffered from sickle cell anemia, the Mont-

gomery County Department of Health and Human Services removed the child in August, 1999. She has not been in her mother's care since then. Indeed, it is not clear that she has even seen her mother since then, for, as the Court notes, petitioner "apparently disappeared." In October, 1999, she showed up at the Department's office without an appointment, expressed a desire to be reunited with Nakera, but refused to supply an address or telephone number and thereby made reunification a virtual impossibility. Nothing was heard from her until March, 2000, when she again made telephone contact with a social worker but cancelled a planned meeting and continued to refuse to disclose her telephone number. She did not attend the CINA hearing in juvenile court in March, 2000, that resulted in Nakera being declared a child in need of assistance. Although this conduct could be viewed in different ways, it more than suggests that Nakera was not very high on petitioner's agenda.

The Department filed its petition for guardianship in December, 2000. The Court has pointed out the exhaustive efforts the Department made to serve that petition and the accompanying show cause order on petitioner and does not fault the Department for those efforts. When all of its attempts at service—even to locate petitioner—failed, the Department sought an order waiving the requirement of notice, in full accord with the then-existing law. Section 5–322(c)(3) of the Family Law Article provided, at the time, that, where the child who is the subject of the guardianship petition had previously been declared CINA, as was the case here, and the court is satisfied, by affidavit or testimony, that the Department has made reasonable but unsuccessful good faith efforts to serve the parent by both certified mail and private process server, the court "shall" waive the requirement of notice. On April 18, 2001, the request was granted and an order was entered waiving the requirement of notice. The Court finds no fault in the granting of that order. Up to that point, it seems, there was no due process violation.

The Constitutional lapse, it appears, arises from the court's refusal to permit petitioner to enter a belated challenge to the

petition for guardianship—after the order waiving the requirement of notice was entered. Section 5–322(d) of the Family Law Article, in existence prior to the 2001 amendment, provided that if a person's notification has been waived under subsection (c), "(1) the court *shall* consider the person ... whose notice is waived to have consented to the ... guardianship; and (2) the petition *shall* be treated in the same manner as a petition to which consent has been given." That was the law under which the court acted. It was the law that we found Constitutional in *In re Adoption No. 93321055*, 344 Md. 458, 687 A.2d 681 (1997). Under that law, as construed by us, the court had no discretion to do other than it did—to treat the petition as if an irrevocable consent had been given.

As the Court points out, there was a significant dispute of fact regarding petitioner's conduct in March and April, 2001, after the request for waiver of notice had been filed but before the order was entered—while there was still time. The trial judge credited the testimony of the clerks and social worker, not that of petitioner, and we must also give credence to that testimony.

Raynelle Miller, the adoption worker assigned to Nakera, testified that petitioner called her on March 19, 2001 and informed Ms. Miller that petitioner did not want to get involved in the dispute between Nakera's father and the child's caretaker. When Ms. Miller asked for a telephone number, petitioner refused to disclose it. Interestingly, the testimony was not that petitioner did not have a telephone, but that "[s]he refused to give me a telephone number." Ms. Miller said that she told petitioner that the department was moving ahead with adoption and that the foster parent was interested in adopting Nakera, and she asked whether petitioner, with her attorney, would want to meet with her and the foster parent. Ms. Miller wanted petitioner's attorney present because the petition for guardianship had already been filed and petitioner and the Department could well be treated as legally adverse parties. Petitioner said she had no attorney and was advised to contact the public defender's office. Two days later, petitioner called again and confirmed that she had

no position in the matter. She said that she had contacted the public defender but had heard nothing. Once again, she refused to give Ms. Miller a telephone number or an address.

May Ping Lu, a clerk in the juvenile court, testified that on March 23, petitioner called her to inquire about the next court date. Ms. Lu suggested she call the public defender. She asked petitioner for an address so that the petition and show cause order could be served, but petitioner refused to give it. Petitioner called again, but again refused to give an address or a telephone number. On March 30, petitioner went to the clerk's office and requested information about her case. Ms. Lu again asked for an address and telephone number, which petitioner refused to provide. Ms. Lu then asked petitioner to wait, while she went to fetch a copy of the petition and show cause order to serve on her, but, when she returned about five to ten minutes later, petitioner was gone. On May 4, accompanied by a public defender, petitioner appeared at the clerk's office and filed a notice of objection to the guardianship petition. The court held a hearing on the matter, listened to all of the testimony, and found, as a fact, that "[i]t is the mother's refusal to provide the Court the information on her address which I think has resulted in her not being served."

So what is unconstitutional? Is it the former statute that required the court to act as it did—the statute that was repealed as of October 1, 2001? Is it something the court did that was not in conformance with the statutory mandate? Is the Court saying that a parent can effectively abandon her child, deliberately frustrate all reasonable attempts to serve her with process specifically designed to explain and safeguard all of her rights, and then waltz into court at the last minute, after the court has *properly* deemed her to have irrevocably consented to the petition, and throw everything back to square one?

The laws governing this procedure were carefully crafted by the Legislature, and the rules of this Court implementing that procedure went through exhaustive review by this Court's Standing Committee on Rules of Practice and Procedure.

Every effort was made to construct a process designed and effective to protect the Constitutional rights of parents, and, in my view, that process *was* effective to protect those rights. The parents' rights, while undoubtedly important, are not absolute. When parents abuse or neglect their children, the State has a paramount right and a paramount duty to assure that those children are not forgotten and left to drift in misery or uncertainty. The procedure followed in this case preserved to petitioner every right to which she was entitled. It was she who frustrated all reasonable attempts to inform her of those rights.

This case must go back because, inexcusably, the Department failed to send notice of the petition to the attorney who represented petitioner in the CINA case. That is a statutory requirement, easy enough in this case to satisfy. Presumably, when the case returns to the Circuit Court, the Department will send the petition to that attorney. Unless service of the petition (which probably will have to be replaced or substantially amended due to the passage of time) is affirmatively waived, efforts will be made to serve it and a show cause order again. Maybe the Department will be able to locate petitioner; maybe it won't. Maybe the public defender's office will still be in the case; maybe it won't. If the Department is unable to effect service, it will follow the new law and publish notice. If, after published notice, the court again enters an order terminating petitioner's parental rights, we will have another appeal challenging the new law providing for published notice, and Nakera will spend another few years of her life—what is left of her precious childhood—in limbo. There is something very wrong with this picture that the Court paints.

Judge RAKER has authorized me to state that she joins in this concurring opinion.