79 A.3d 428

Scott BALDWIN

v.

Amy L. BAYNARD.

No. 65, Sept. Term, 2013.

Court of Special Appeals of Maryland.

Nov. 6, 2013.

84

Cynthia E. Young, Annapolis, MD, for appellant.

Robert Erdmann (Warfield, Darrah & Erdmann, PC, on the brief) Severna Park, MD, for appellee.

Panel: MATRICCIANI, BERGER, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

BERGER, J.

This case arises from an Order of the Circuit Court for Anne Arundel County modifying custody of the parties' 14–

year–old daughter ("Daughter"). Prior to the initiation of the instant litigation, Amy Baynard ("Mother") had primary physical custody and Scott Baldwin ("Father") had visitation on alternate weekends and specified holidays. Pursuant to an agreement between the parties, the parties had joint legal custody. On April 3, 2009, Mother filed a Motion to Modify Custody and Visitation after learning about allegations of sexual abuse perpetrated by Father upon Mother's niece. Father's visitation was initially suspended and then modified to allow supervised visitation pending trial. The matter ultimately proceeded to trial on January 14, 15, 16, 17, and 18, 2013. The court delivered its ruling on January 25, 2013, granting Mother primary physical and sole legal custody of Daughter, with supervised visitation to Father on alternate Sundays. The order also awarded attorney's fees to Mother in the amount of $15,000. This timely appeal followed.

On appeal, Father presents three issues for our review, which we have rephrased as follows:

I. Whether the circuit court erred in granting Father supervised visitation with Daughter.

II. Whether the circuit court erred in granting Mother sole legal custody of Daughter.

III. Whether the circuit court abused its discretion in awarding Mother attorney's fees.

For the reasons set forth below, we affirm the judgment of the Circuit Court for Anne Arundel County.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother began a romantic relationship as teenagers in 1993. During their relationship, Mother and Father had a daughter, Daughter, who was born on April 7, 1999. The parties were never married. Mother and Father's relationship ended in May of 2001. Mother filed for custody in the Circuit Court for Anne Arundel County on September 8, 2003. Mother and Father entered into a custody agreement on March 18, 2004. On November 29, 2007, pursuant to another agreement between the parties, the court entered a

consent order regarding custody and visitation, providing that Mother have primary physical custody of Daughter. Under the agreement, Father had visitation on alternate weekends and specified holidays. The parties agreed to maintain joint legal custody.

In April 2009, Mother learned that her niece ("Niece") alleged that she had been sexually abused by Father over a period of five years. Niece lived in North Carolina but visited Maryland during the summers for a period of six to eight weeks, usually staying either at Mother's house or at her grandmother's house. The alleged abuse began in the summer of 2000, when Niece was eleven years old, and continued through the summer of 2004, when Niece was fifteen years old. At the time the alleged abuse began, Father was twenty-one years old.

In 2007, Niece disclosed the alleged abuse to her therapist, and in the spring of 2008, she disclosed the abuse to her mother ("Niece's mother"). Niece asked that her mother not tell the rest of her family because she felt ashamed. However, during the Easter weekend of 2009, Niece's mother disclosed the abuse to Mother.[1] Subsequently, Mother and Niece discussed the abuse allegations. Based upon this new information, Mother filed a motion to modify custody and visitation, which is the subject of the instant case. On April 3, 2009, the court ordered that Father's visitation be temporarily suspended. On April 10, 2009, the court ordered that, pending trial, Father would receive one day of supervised visitation on alternate weekends.[2] The circuit court also ordered a custody evaluation, which was completed by Terri Hager, MSW ("the Evaluator").

---

1. After the disclosures to her family, Niece ultimately contacted the police and Father faced criminal charges relating to Niece's allegations. The first criminal trial resulted in a hung jury; in the retrial, Father was acquitted.

2. The order provided that Father was to give notice to Mother of which day he would visit—Saturday or Sunday—at least two days prior to the date of the visit. Father's visitation was from 10:00 a.m. to 6:00 p.m., and was to be supervised by Father's parents or sister.

The custody and visitation issues proceeded to trial on January 14, 15, 16, 17, and 18, 2013.[3] The court heard testimony from Niece, Niece's mother, the Evaluator, Esther Carr (Mother's mother), Wanda Ball–Gross (Father's sister), Glenn Mosco (the father of Father's fiancée), Mother, Kristine Lowe (Father's friend), Matthew Maguire (Father's friend), Nicole Surguy (Father's friend), Rose Baldwin (Father's mother), Maurice Baldwin (Father's father), Father's fiancée ("Fiancée"), and Father.

Niece testified at length regarding the sexual abuse perpetrated by Father. She testified that the sexual abuse began with kissing during the summer of 2000. During the summer of 2001, when Niece was twelve years old, Father had Niece perform oral sex on him, masturbated in Niece's presence, performed oral sex on Niece, and inserted his fingers in Niece's vagina. In the summer of 2002, when Niece was thirteen years old, Father engaged in sexual intercourse with Niece. Niece testified that the sexual abuse continued during the summers of 2003 and 2004.

Niece testified that during the time she was being sexually abused, she believed that she and Father were in a relationship. Father told Niece that at some point in the future, they would be able to present themselves as a couple. Father also told Niece disparaging information about her family as a way to distance Niece from her family and prevent her from disclosing their relationship. Father told Niece that if her family "found out about what was going on," they would "have to run away together." In 2004, when Niece was fifteen years old, the abuse ended when Niece ended the relationship with Father and began to avoid spending time alone with Father. At that time, Niece had not disclosed any of the abuse to anyone in her family. Niece acknowledged that she had

---

3. In addition, at trial, the circuit court heard argument regarding six petitions for contempt that had been filed by Father. All petitions for contempt were either withdrawn or denied. No appeal was taken from the denials of the various contempt petitions.

substance abuse and mental health problems in the past. Niece, however, testified that she has been "clean" since 2011.

Niece's mother testified about the sexual abuse allegations and also testified about Mother's good character and reputation. Niece's mother described Mother and Daughter's relationship as close and testified that she found Mother to be a fit and proper parent. Niece's mother did not believe Father was a fit and proper parent to have custody of Daughter. Niece's mother explained that Father has an intimidating personality and "withholds affection, if he doesn't get what he wants." Niece's mother also expressed concerns for Daughter's safety if Father were allowed to have unsupervised visitation, given the alleged abuse perpetrated by Father upon Niece.

The Evaluator testified that Mother's concerns for Daughter's safety regarding allegations of sexual abuse were valid.[4] The Evaluator testified that she found Mother to be cooperative throughout the interview process. Father was usually cooperative as well, but on two occasions made threats of retribution to the Evaluator. Specifically, Father indicated that he would continue to appeal the matter if the Evaluator did not make the recommendations Father desired. Father also told the Evaluator that he would seek to have her lose her professional license if she made recommendations that were unfavorable to Father. The Evaluator testified that Daughter reported that Father made disparaging comments about Mother, including telling Daughter that Mother would be going to jail. Daughter reported that Mother did not make disparaging comments about Father. Daughter was not aware of the sexual abuse allegations or the reasons the custody evaluations were taking place.

The Evaluator was aware of the allegations of sexual abuse perpetrated by Father upon Niece. She was also aware of prior allegations of sexual abuse by Father. Specifically, in

---

**4.** The Evaluator was involved from April 2009 until the time of trial. She submitted three custody evaluations in addition to testifying at trial.

2006, the minor sons of Fiancée had alleged that Father sexually abused them. The Department of Social Services entered a finding of indicated abuse. Father appealed to the Office of Administrative Hearings and an administrative law judge modified the finding to unsubstantiated. Fiancée's father, Glenn Mosco, ultimately obtained permanent custody of Fiancée's three minor sons on August 22, 2007.

The Evaluator recommended that Mother be awarded sole legal and primary physical custody of Daughter and that Father have monitored visitation from Friday through Sunday on alternate weekends.[5] The Evaluator recommended the monitored status contingent on several factors: (1) Daughter would meet with a therapist monthly; (2) Mother would reinitiate individual therapy; and (3) Mother would follow all recommendations of the Talbot County Department of Social Services.[6]

The Evaluator noted, however, that if the Court were to find that there had been inappropriate sexual contact between Father and Niece or between Father and Fiancée's sons, the recommendation would change. In that instance, the Evaluator would recommend supervised visitation between Father and Daughter.

The Evaluator recommended sole legal custody because of ongoing communication issues between Mother and Father. The Evaluator explained:

---

5. The Evaluator recommended monitored visitation which would include one of Father's parents checking on Daughter at least one time each day during visitation. Alternatively, the Evaluator recommended that Daughter could stay overnight in the home of the paternal grandparents' instead of staying overnight in Father's home. The Evaluator further provided that the parties could agree to another monitor. Fiancée was not considered an appropriate monitor due to her having been court ordered to maintain supervised visitation with her own children.

6. Mother had an ongoing case with the Department of Social Services due to an anonymous report of neglect. The Department of Social Services was in the process of entering a "ruled out" finding, but Mother was still receiving assistance with organization and keeping her home tidy from a Department of Social Services worker.

What I believe is that right now it's best to maintain sole custody, because I don't ever believe that there's potential for the two of you to have a better relationship than you current[ly] have. At this time, I have no reason to believe that [Mother] is going to feel differently about you, nor do I have any reason to believe that you are going to feel differently or be able to interact with her any better.

Esther Carr, Mother's mother and Daughter's grandmother, testified about the allegations of sexual abuse perpetrated by Father upon Niece. Ms. Carr testified that Mother and Daughter have a close and loving relationship and that Mother is a good parent. Ms. Carr testified that she believes that Mother is a fit and proper person to have primary physical and sole legal custody of Daughter. Ms. Carr explained that Daughter has a great support system with Mother and her extended family. Ms. Carr did not find Father to be a fit parent based upon the allegations of abuse, as well as Father's controlling nature and anger issues.

Wanda Ball–Gross, Father's sister, testified that Mother is a fit and proper parent to have primary physical and sole legal custody of Daughter. Ms. Ball–Gross testified that she no longer has a relationship with Father. In 2003, an altercation occurred between Father, Mother, and Ms. Ball–Gross in which Father pushed Ms. Ball–Gross into Mother, causing Ms. Ball–Gross, who was nine months pregnant, to fall onto her stomach. Ms. Ball–Gross called 911, and Father was arrested. Thereafter, an ambulance arrived to transport Ms. Ball–Gross to the hospital. Ms. Ball–Gross testified that she found Father to be arrogant, cocky, and controlling.

Glenn Mosco, the father of Fiancée, testified that he currently has custody of three of his daughter's children.[7] Mr. Mosco testified regarding the allegations of sexual abuse perpetrated by Father upon Fiancée's sons. Mr. Mosco also testified that his daughter had previously threatened to harm

7. Fiancée also has two children with Father, who live with Father and Fiancée.

the children. Mr. Mosco was awarded permanent custody of Fiancée's three sons in 2006. Fiancée was awarded supervised visitation. Mr. Mosco testified that he believes that Father sexually abused his three grandsons.

Mother testified that she and Father lived together from 1999, when Mother was pregnant with Daughter, until May of 2001. She now lives in Easton in a home she rents from her mother. Mother has two children, both of whom reside with her: Daughter and a younger child, who is six years old. Mother was married to the younger child's father, Scott Baynard, but they separated in December of 2008 and divorced on August 22, 2012.

According to Mother, during the course of Mother and Father's relationship from 1993 to 2001, Father was physically, verbally, and emotionally abusive. Mother described, among other things, being choked, thrown downstairs, pushed, and locked outside in the cold. Regarding the verbal abuse, Mother testified that Father called her "crazy," "nutcase," "whore," "slut," "cunt," and "bitch." Father told Mother that she was worthless and that nobody would ever want her but him. Mother testified that the abuse lasted throughout the entire relationship, beginning approximately one year into the relationship.

Mother also recounted the 2003 altercation between Father, Ms. Ball–Gross, and herself, which resulted in Ms. Ball–Gross falling on her stomach. Mother explained that the argument began between Mother and Father over a disagreement about disciplining Daughter. Mother arrived at Father's house and found Daughter sitting in the dark at the kitchen table, as a punishment for misbehavior. Mother told Daughter she could get up, but Father disagreed. The argument quickly escalated and became physical; ultimately Father pushed Ms. Ball–Gross into Mother, causing Mother to fall down the deck stairs and Ms. Ball–Gross to fall on her stomach. At that point, Ms. Ball–Gross called 911. Father threatened to kill both Mother and Ms. Ball–Gross, and then pulled Daughter from Mother's arms. After the police and ambulance arrived, Father was

arrested and Ms. Ball–Gross was transported to the hospital. As a result of this incident, Mother filed for and was awarded a one-year protective order against Father. The protective order awarded custody of Daughter to Mother. Since 2003, Mother has maintained primary physical custody pursuant to agreements entered into between the parties in 2004 and 2007.

Mother testified that although Daughter is a typical teenager who sometimes pushes limits, Daughter and Mother share a close relationship. Daughter is very involved in her school band and plays the clarinet. Mother believes that involvement in band has helped Daughter learn teamwork and gain responsibility. Daughter attends middle school and maintains grades in the A and B range. Mother testified that Daughter has close friends in Easton with whom she attends school and socializes with outside of school.

Mother acknowledged that a representative from the Talbot County Department of Social Services recently came to her home after receiving an anonymous report. The DSS worker told Mother a "ruled out" finding would be entered, but that Mother would still be eligible to receive services, including a referral for trauma counseling and assistance with purchasing items to better organize the home.

Mother testified that Daughter's health is good and her medical and dental appointments are up to date. Mother noted, however, that Daughter has been in counseling on and off since fifth grade. Father was not in agreement with Daughter's involvement in therapy, and Mother described one instance in which Father refused to sign a consent for Daughter to enter into therapy. Mother testified that Father "doesn't believe in therapy," but Mother believes that therapy is useful for Daughter in order for her to learn to cope with everything that has happened between Mother and Father.

Mother also testified regarding her own mental health. Mother and Father had another daughter who was born in October 2000 and died a month later. Mother said that the time of year surrounding the anniversary of Emily's death is challenging for her and that she tends to be depressed and

anxious during that time of year. As a result, Mother has a more difficult time keeping the home tidy during this time of year. To cope with her anxiety and depression, Mother previously saw a therapist, but did not feel a connection with her. The Department of Social Services referred Mother to a trauma therapist, with whom Mother was planning to begin therapy shortly after the trial.

Mother testified regarding disputes surrounding Father's weekend visitation days. Pursuant to the April 2009 order, Father was entitled to one day of visitation on alternate weekends and was required to notify which day he would have visitation—Saturday or Sunday. One weekend when Father was scheduled to visit, Mother planned to take Daughter to Ocean City for her birthday. Mother had discussed the plan with Father and they agreed that Mother would take Daughter to Ocean City on Saturday and Father would have visitation on Sunday. Father told Mother that his work schedule had changed and he wanted to switch his visitation to Saturday. Having already made the arrangements for the hotel in Ocean City, Mother did not change her plans. As a result, Father filed a petition for contempt and a request for emergency hearing. The trial court denied Father's petition.

Regarding the supervision of Father's visitation, Mother expressed concerns over whether Father's parents were providing adequate supervision. Mother testified that she learned from Daughter that she and Father had been playing video games in the basement, out of the sight of Father's parents. The April 2009 order requires Father's parents to supervise visitation and keep Father within eyesight at all times. Mother testified that she does not believe that Father's parents can adequately supervise Father's visits with Daughter.

Mother further testified regarding Niece's visits to Maryland during the summers of 2000 through 2005. Mother testified that Father and Niece had various opportunities to be alone together, including times Niece spent the night at Father's home. Mother indicated that beginning during the

summer of 2001, Niece engaged in self-mutilation by cutting her arms and legs. Mother testified that this was a change in Niece's demeanor, beginning in 2001. Mother testified that she filed for an emergency change in custody and visitation after learning of Niece's allegations of abuse by Father.

Mother testified at length regarding her financial status and employment. Mother is employed part-time at a restaurant, earning $8.25 per hour. Mother has no savings or credit cards, and Mother's mother helps Mother pay her bills.

Father called three friends and his parents as witnesses. Kristine Lowe, Father's friend who has known him since 2005, testified that Daughter loves Father. Ms. Lowe was aware of the Allegations involving Fiancée's sons but testified that she did not believe Father abused the boys. Matthew Maguire, Father's friend who has known him since 2009, testified that Father and Daughter appear to have a very close relationship. Mr. Maguire described Father as a good neighbor, a good friend, and a good parent. Mr. Maguire did not believe that Father sexually abused either Niece or Fiancée's sons. Mr. Maguire has not met Niece nor spoken to Fiancée's sons. Mr. Maguire indicated that there were times he was at Father's home and was with Father and Daughter in the backyard while Father's parents were inside the home.

Nicole Surguy has known Father for over twenty years. She described Father as a "really, really great father" who is "very loving." Additionally, Ms. Surguy testified that Father is kind, respectful, great-hearted, law-abiding, and a very upstanding citizen. Ms. Surguy did not consider Father controlling. Ms. Surguy saw Daughter fifteen or sixteen times within the past year and testified that she observed Father's interactions with Daughter, as well as with Father's two younger children, as very positive. Ms. Surguy testified that she does not believe that Father ever sexually abused a child. Ms. Surguy was aware of the allegations surrounding Niece, but did not believe the allegations to be true.

Rose Baldwin, Father's mother and Daughter's grandmother, testified that Father is a good parent. Ms. Baldwin was

aware of Fiancée's sons allegations, but did not believe them. Ms. Baldwin did not believe that Father's visitation needed to be supervised. Ms. Baldwin described Father as caring, kind, and generous. Further, Ms. Baldwin indicated that Father and Daughter have a close and loving relationship. Regarding Mother's character, Ms. Baldwin testified that Mother is moody and changes from one minute to the next. Ms. Baldwin testified that her daughter, Wanda Ball–Gross, is an untruthful person.

Maurice Baldwin, Father's father and Daughter's grandfather, testified similarly to Rose Baldwin. Mr. Baldwin testified that he has no concerns regarding Daughter's safety while in Father's care, and that Father and Daughter have a good, loving relationship and that Father is a fit and proper parent. Mr. Baldwin testified that he has never observed Father engage in any kind of abuse. Mr. Baldwin stated that he supervised Father's visitation with Daughter, but there were times that Father and Daughter went outside while Mr. Baldwin remained inside. Still, Mr. Baldwin could see Father from within the house. Mr. Baldwin testified that Father remained within his eyesight except for when he had to use the restroom. Regarding Wanda Ball–Gross's truthfulness, Mr. Baldwin testified that she has at times been untruthful.

Fiancée testified that she has a close relationship with Daughter and has known Daughter since she was three years old. Fiancée testified that Father is a great parent and that he is not controlling. Fiancée testified that she has three sons from a previous relationship who are currently in the custody of her father, Glenn Mosco. She knew that the Department of Social Services had initially made a finding of "indicated" sexual abuse by Father, but that it was later modified to "unsubstantiated." Fiancée testified that she currently has supervised visitation with her three sons and she sees the boys once each year. Fiancée testified that her father keeps her from seeing the boys more frequently. Fiancée acknowledged that she had been diagnosed with bipolar disorder and anxiety, for which she is currently in therapy and takes medication. Fiancée indicated that Father is supportive of her involvement

in therapy. Fiancée testified that Daughter has friends near Father's home and enjoys playing with her younger brother and sister when she visits. Fiancée further testified that she has no concerns leaving her children alone with Father.

Father testified and denied all allegations of sexual abuse. He further denied that there was an abusive relationship between himself and Mother. Rather, Father testified that he believed the allegations were fabricated by Mother in an attempt to retain custody of Daughter. According to Father, in the spring of 2009, Mother frequently argued with her then-husband, John Baynard, in front of Daughter. Father was concerned that Daughter was exposed to fighting and told Mother he would be seeking custody. Father testified that he believes Mother somehow talked Niece into going forward with the abuse allegations only to keep Father from obtaining custody of Daughter. Father also emphasized that he was found not guilty of sexually abusing Niece in the criminal case, noting that the first criminal trial resulted in a hung jury and that, when the case was retried, Father was acquitted. Father testified that he spent $50,000 on his criminal defense.

Regarding his financial status, Father testified that he earns just under $18.24 per hour as an Equipment Operator for Anne Arundel County. At the time of trial, Father was receiving worker's compensation in the amount of $800 bi-weekly due to neck surgery, but was scheduled to begin work without restrictions as of February 19, 2013. Father testified that he works full-time and often works overtime on Saturdays, for which he is paid time-and-a-half. He purchased his parents' old home in 2005, and also sold a trucking business and purchased "a bunch of real estate," including a house in California and two houses in Florida.

The court delivered its oral ruling from the bench on January 25, 2013. First, the circuit court explained that as a threshold matter, it found there was a material change in circumstances since the last order. Specifically, the material change in circumstances was the disclosure by Niece and the allegations of sexual abuse. Having found a material change

of circumstances, the court turned to an analysis of the best interests of Daughter. The court found that while Mother may have some areas in which she could improve (including obtaining mental health counseling or treatment), Mother had strengths as well. The court emphasized Mother's love and commitment to Daughter, as well the fact that Daughter has done well academically, socially, and emotionally, while in Mother's care. The court noted that Mother did an incredible job shielding Daughter from the allegations made against Father. The court found Mother to be a fit parent.

Regarding Father, the court found that he also loves and is committed to Daughter, but he is somewhat controlling and demanding. The court found it to be unfortunate that Father has made negative comments to Daughter about Mother.

Considering the character and reputation of the parties, the court found that both parents have "a reasonably good reputation and character," with some exceptions. Specifically, the court referenced the testimony that Father had a history of being verbally, physically, and emotionally abusive to Mother, as well as the allegations of sexual abuse.

Considering the desire of the parents, the court noted that each party currently desires primary physical custody of Daughter, but that, in the past, Mother has had primary physical custody. Regarding the potential for maintaining natural family relations, the court believed that Mother would attempt to include Father in Daughter's life if she were awarded primary physical custody, but did not believe that Father would include Mother. The court considered the preference of the child, noting that Daughter is old enough and mature enough to explain her preference. Although Daughter did not testify, the court noted that based upon the evidence, it surmised that Daughter seemed to be happy and content living with Mother, and that Daughter also wished to spend more time with Father than she was currently.

Regarding material opportunities affecting the future life of the child, the court found that Father had a more consistent and meaningful work history and an increased ability to earn a

living. Mother had struggled with maintaining full time employment, but the court found that had not been to Daughter's detriment because of the financial generosity of Mother's mother. Regarding the age, health, and sex of the child, the court found that Daughter was a thirteen-year-old girl in generally good health.

The court, in considering the residence of the parents and the opportunity for education, found that each parent has adequate and appropriate housing. Regarding the length of separation of the parents, the court noted that the parties have been separated for an excess of ten years; the court found this factor to not be particularly relevant to its consideration of custody and visitation. The court further found that there had been no abandonment or surrender of custody of Daughter.

Regarding whether shared physical or joint legal custody was appropriate, the court considered additional factors, explaining:

I look at the capacity of the parents to communicate and reach shared decisions affecting the child's welfare. At this point I do not think that—[Daughter]'s parents have the ability to communicate and reach shared decisions. And I realize that they have agreed to have joint legal custody in the past. I am not sure that was even wise because I do not think they have had that ability for quite some time.

I do believe, and I accepted the testimony, that [Father] was verbally, emotionally and physically abusive towards [Mother] in the past. It is unfortunate but the parties cannot even agree on how to do something that should not be too terribl[y] difficult, such as exchanging a Saturday visit for a Sunday visit. And because they are challenged in that area . . . that suggests to me that they just cannot, for whatever reason communicate effective[ly] with one another when it comes to [Daughter]'s welfare.

The next thing I look at is the willingness of parents to share custody. Neither parent presented me during the course of the trial with any evidence or even argued that

they would want to share legal of [sic] physical custody of [Daughter].

The court also considered the relationship between the child and each parent, emphasizing that Daughter clearly has a more substantial relationship with Mother given the amount of time she spends with her. Regarding any disruption of Daughter's social and school life, the court noted that a shared physical or legal custody arrangement would have a significant detrimental affect on Daughter, and that the "social and educational life that is occurring right now for [Daughter] would be damaged should I award joint legal custody or any type of shared custody arrangement." The court emphasized that the parents live forty miles apart from one another.

The court noted that neither party's employment precludes them from actively parenting Daughter, and instead, looked at demands of parental employment. Regarding the sincerity of each parent's request, the court noted that both parents said they wanted sole custody of Daughter. Considering the financial status of the parties, the court found that although Father has a more stable employment and earning history, Mother was receiving assistance from her Mother. The court noted that it was not aware of any impact on state or federal assistance. The court found that the parents would not benefit from a joint legal or shared custody arrangement; rather, the court thought it would be more likely to cause additional stress to them, which could then trickle down to Daughter.

In conducting the best interests analysis, the court explicitly stated that, "setting aside the allegations of child abuse, regardless of whether they are true or not, I would say that just looking at the factors I have given you and them and them alone, I would grant [Mother] primary physical and sole legal custody of [Daughter]." As for physical custody, the court noted that it would be in Daughter's best interest to remain with Mother because Daughter is "flourishing in [Mother's] care" and because Mother has always been Daughter's primary caretaker. The court also emphasized that the

bulk of Daughter's friends and family are primarily in the Easton area, where Mother resides, and that Daughter seems happy living with Mother. The court explained:

I was not given a single valid or credible reason in my mind why it would make sense to disturb the current physical custody arrangement. And that is without even considering the child abuse allegations.

Regarding legal custody, the court concluded that Mother should be awarded sole legal custody, explaining as follows:

It is clear that the parties cannot effectively communicate. I do not see that that will get better [at] any point in the future. The parties are not desirous. of sharing decision making responsibilities. The parties have reached stalemates in the past. For example, [Mother] wanted [Daughter] to enter into counseling, [Father] did not. Ultimately that was resolved, but they reached stalemates on things that should not be too terribly difficult.

And I also believe that [Father] has a history of trying to intimidate [Mother], which would not put them in a good position as far as negotiating with each other.

Also, I should point out, when given the chance in the past that parties have not been able to set aside their differences and work together to do what is in [Daughter]'s best interest.

Since the parties separated [Mother] has been the one who has made educational and medical decisions for [Daughter], when the parties could not reach an agreement. She has been the one primarily . . . responsible for [Daughter]'s education. The one who has made sure that [Daughter] has received appropriate medical care. She has also, given my prior statement, going to be the person who ends up with primary physical custody. I find that she is more even tempered than [Father].

Given all that and everything that I have said, I believe it is in [Daughter]'s best interest that . . . sole legal custody be awarded to [Mother].

The court also noted that, in addition to completing the best interests analysis, it had reviewed and considered Md.Code (1984, 2012 Repl.Vol.), § 9–101 of the Family Law Article ("FL"). Section 9–101 of the Family Law Article governs the steps that a court must take when it has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding in considering the possibility of future abuse by the party. The court found, by a preponderance of the evidence, that there were reasonable grounds to believe that abuse occurred. Specifically, the court found that Mother "has established that [Father] abused [Niece] when she was a minor child." [8] Regarding the Niece's allegations, the court explained:

> I do not think it is necessary for me to recap the testimony of [Niece]. In short, I fully believe [Niece]'s testimony. I watched her testify. I saw the pain in her eyes when she recounted the sexual acts that took place between [Father] and her. I found her to be credible despite the fact that she suffered from substance abuse problems, mental health difficulties and despite some minor inconsistencies [Father] pointed to.

> The whole idea that this [is] some type of conspiracy or that the allegations were fabricated is ludicrous. The fact that some individuals have an opinion of [Father] that he did not or could not have committed child abuse does not surprise me. The type of abuse that was described in this case is the kind of thing that is done in private.

> It is not inconsistent with the descriptions of [Father's] character provided by his witnesses. Those witnesses are simply not aware of this part of [Father's] life.

Having found that Father previously sexually abused a minor, the court then considered the likelihood of future abuse by Father. The court noted that Daughter is currently the same age as Niece was when the abuse was ongoing. The

---

8. The court explicitly stated that it did not consider Fiancée's sons abuse allegations in reaching its conclusions.

court further emphasized Father's refusal to acknowledge the past abuse, explaining:

> [Father] has surrounded himself with others to whom he has maintained his innocence. He is blaming others who he believes were involved in some significant conspiracy or he believes have a vendetta against him. And who he blames for bringing the abuse out into the open. He has no insight into his abusive behavior simply because he denies it ever occurred.

Accordingly, the court did not make a finding that there was no likelihood of further child abuse being perpetrated by Father.

Considering Father's access to Daughter, the court awarded Father supervised visits with Daughter on alternating Sundays from 10:00 a.m. to 6:00 p.m. The court ordered that the visits be supervised by Father's parents, or alternatively, by an off-duty Anne Arundel County Sheriff at Father's expense. The court emphasized that Father must be supervised at all times and that the supervision was put in place to "assure the safety and the physiological, psychological, emotional well-being of [Daughter]."

Regarding an award of attorney's fees, the court noted that it was "required to consider the financial status of each party, the needs of each party and whether there was substantial justification for bringing, maintaining or defending the proceeding." Considering the financial status of the parties, the court found that Father has the ability to earn more than twice what Mother has the ability to earn. The court took into account that Father had no legal fees for the current proceeding but had incurred significant legal fees in the prior criminal case.

The court noted that it did not have much evidence regarding the needs of each party, but that Mother "has a lot of difficulty making ends meet" and often "has to rely on the help of her mother." The court found that both Father and his fiancée, at the time of the trial, were receiving either disability benefits, unemployment benefits, or worker's compensation

benefits. Regarding whether there was substantial justification for bringing, maintaining or defending the proceeding, the court found that Mother "absolutely had substantial justification in bringing this action" and that Mother "was absolutely justified in defending against [Father's] claim for custody." The court noted that "[b]ut for [Father's] acts of abuse, which I found occurred, I do not think we would have been here for a five day modification of custody case." The court found that the attorney's fees incurred by Mother were fair.

The court observed that Father "is not a wealthy person" yet concluded that "[Father] should share in the cost of the attorney's fees." While noting that the total fees incurred by Mother were "a little over $40,000," the court awarded attorney's fees in the amount of $15,000, to be paid by Father within eighteen months. Father timely noted an appeal on the issues of visitation, legal custody, and attorney's fees.

## STANDARD OF REVIEW

This court reviews child custody determinations utilizing three interrelated standards of review. *In re Yve S.,* 373 Md. 551, 586, 819 A.2d 1030 (2003). The Court of Appeals described the three interrelated standards as follows:

We point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c) ] applies. [Second,] if it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* at 586, 819 A.2d 1030. In our review, we give "due regard . . . to the opportunity of the lower court to judge the credibility of the witnesses." *Id.* at 584, 819 A.2d 1030. We recognize that "it is within the sound discretion of the [trial court]

to award custody according to the exigencies of each case, and . . . a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. Such broad discretion is vested in the [trial court] because only [the trial judge] sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor." *Id.* at 585–86, 819 A.2d 1030.

We review the award of counsel fees under the abuse of discretion standard. *Meyr v. Meyr,* 195 Md.App. 524, 552, 7 A.3d 125 (2010). The circuit court's decision regarding the award of fees "will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong." *Petrini v. Petrini,* 336 Md. 453, 468, 648 A.2d 1016 (1994).

## DISCUSSION

### I.  Visitation

██ Father argues that the circuit court misapplied § 9–101 of the Family Law Article, which requires the court to assess the likelihood of future abuse after finding reasonable grounds to believe a party has previously abused or neglected a child. As such, Father maintains that the ruling imposing supervised visitation must be vacated. We disagree.

██ Section 9–101 of the Family Law Article provides:

(a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation

arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

FL § 9–101. Pursuant to FL § 9–101, the court must engage in a two step process. First, the court must consider whether there are reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding. *Id.* The preponderance of the evidence standard applies when the court determines whether reasonable grounds exist. *Volodarsky v. Tarachanskaya*, 397 Md. 291, 308, 916 A.2d 991 (2007). Second, the court must determine whether it has been demonstrated that there is no likelihood of further abuse or neglect by the party. The court is explicitly prohibited from granting custody or unsupervised visitation to a party who has abused or neglected a child unless the court specifically finds that there is no likelihood of further abuse or neglect. Moreover, "[t]he burden is on the parent previously having been found to have abused or neglected his or her child to adduce evidence and persuade the court to make the requisite finding under § 9–101(b)." *In re Yve S.* 373 Md. 551, 587, 819 A.2d 1030 (2003). Accordingly, in the instant case, the burden fell upon Father to prove that there was no likelihood of further abuse—not upon Mother to prove a likelihood of further abuse.

The court explicitly found, by a preponderance of the evidence, that Father sexually abused Niece over a period of six years when she was a minor. Having found that Father previously engaged in child sexual abuse, the court then considered whether Father had established that there was no likelihood of further abuse. The court found that Father had "no insight into his abusive behavior simply because he denies it ever occurred." Rather, the court found Father was "blaming others who he believes were involved in some significant conspiracy or he believes have a vendetta against him." Further, the court found that "[t]he whole idea that this [is] some type of conspiracy or that the allegations were fabricated is ludicrous." The court emphasized that it was "very concerned about the welfare of [Daughter], should she be in [Father's] care. I am concerned in the sense that he would cause abuse

to [Daughter]—similar to the abuse that he caused [Niece]." These findings and conclusions are well supported by the record and do not reflect error by the circuit court.

Father argues that there was no factual basis to support the circuit court's conclusion that future abuse was likely to occur. We hold that the circuit court articulated sufficient facts upon which to base its conclusion that abuse was likely to occur in the future. The circuit court emphasized that Daughter's current age is similar to Niece's age at the time she was abused, that Father had no insight into his prior abusive behavior, and Father blamed others for an elaborate conspiracy rather than recognizing his own personal responsibility. The circuit court did not simply assume that future abuse would occur based upon an earlier act of abuse. Rather, the circuit court considered the circumstances of the previous abuse, as well as Father's lack of insight into his abusive behavior, in reaching its conclusion. These facts are more than sufficient to support a finding that there was a likelihood of further abuse.

More importantly, however, Father misconstrues the statute. Section 9–101(b) of the Family Law Article does not preclude custody or unsupervised visitation only upon a finding of a likelihood of further abuse; rather, the statute precludes custody or unsupervised visitation *absent a specific finding by the circuit court that there is no likelihood* of further child abuse or neglect by the party. FL § 9–101(b) (emphasis added). It was Father's burden, therefore, to present evidence that there was *no likelihood* of further abuse. *In re Yve S., supra,* 373 Md. at 587, 819 A.2d 1030. The circuit court concluded, based upon the evidence, that Father had not presented sufficient evidence for it to make such a finding. We are persuaded that there is sufficient evidence to support the circuit court's determination that it could not make a finding that there was no likelihood of further abuse by Father. Moreover, consistent with § 9–101(b), the circuit court carefully crafted a supervised visitation arrangement that would assure "the safety and the physi-

ological, psychological, and emotional well-being" of [Daughter].

■■ Furthermore, the circuit court was not required to base its decision regarding supervised visitation solely on § 9–101 of the Family Law Article. Although § 9–101 of the Family Law Article lays out specific steps the trial court must take in determining custody and visitation in cases when a parent has been found to have committed abuse or neglect in the past, the source of the court's authority to make custody and visitation determinations does not stem from § 9–101 alone. The Court of Appeals has explained:

> Pursuant to the doctrine of *parens patriae*, the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. We have held that the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute. That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. [T]he child's welfare is a consideration that is of transcendent importance when the child might otherwise be in jeopardy. Therefore, visitation may be restricted or even denied when the child's health or welfare is threatened.

*In re Mark M.*, 365 Md. 687, 705–06, 782 A.2d 332 (2001). The best interest of the child standard is the overarching consideration in all custody and visitation determinations. In assessing the best interests of the child, "[a] trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests." *Id.* at 706, 782 A.2d 332.

Further, a history of abuse is clearly relevant to the best interests analysis as well as the § 9–101 analysis. The Court of Appeals has explained:

> Even without regard to § 9–101 [of the Family Law Article], if the court concludes that there is a likelihood of a

party subjecting a child to abuse or neglect, whether that conclusion is drawn from evidence of past abuse directed against the child whose custody or visitation is at issue or against another child, it has been authorized to deny custody to and limit visitation with that party. Section 9–101 focuses the court's attention and gives clear direction in the exercise of its discretion.

*In re Adoption No. 12612 in Circuit Court for Montgomery County*, 353 Md. 209, 237–38, 725 A.2d 1037 (1999). Given the significant evidence presented in this case demonstrating that Father previously abused a minor child over several years, the circuit court did not err in determining that unsupervised visitation would be detrimental to Daughter's best interests. As the court articulated, the supervised visitation arrangement was put in place to "assure the safety and the physiological, psychological, emotional well-being of [Daughter]." We conclude that the circuit court's factual findings were not clearly erroneous, and the circuit court's ruling was founded upon sound legal principles. Accordingly, the determination that Father's visitation must be supervised was well within the discretion of the circuit court.

## II. Legal Custody

Next, Father contends that the court erred in awarding Mother sole legal custody of Daughter.[9] Father's contention is without merit.

It is well established that the following factors ("the *Taylor* factors") are considered by a court when determining whether sole or joint legal custody is appropriate: (1) capacity of parents to communicate and to reach shared decisions affecting child's welfare, (2) willingness of parents to share custody, (3) fitness of parents, (4) relationship established between child and each parent, (5) preference of child, (6)

---

9. "Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare." *Taylor v. Taylor*, 306 Md. 290, 296, 508 A.2d 964 (1986).

potential disruption of child's social and school life, (7) geographic proximity of parental homes, (8) demands of parental employment, (9) age and number of children, (10) sincerity of parents' request, (11) financial status of parents, (12) impact on state or federal assistance, and (13) benefit to parents. *Taylor v. Taylor*, 306 Md. 290, 304–11, 508 A.2d 964 (1986). Not all of the factors are necessarily weighed equally; rather, it is a subjective determination. *See id.* at 302, 508 A.2d 964 ("Formula or computer solutions in child custody matters are impossible because of the unique character of each case, and the subjective nature of the evaluations and decisions that must be made."). Regarding the capacity of parents to communicate and to reach shared decisions affecting child's welfare, the Court of Appeals has explained:

> *Capacity of the Parents to Communicate and to Reach Shared Decisions Affecting the Child's Welfare.* This is clearly the most important factor in the determination of whether an award of joint legal custody is appropriate, and is relevant as well to a consideration of shared physical custody. Rarely, if ever, should joint legal custody be awarded in the absence of a record of mature conduct on the part of the parents evidencing an ability to effectively communicate with each other concerning the best interest of the child, and then only when it is possible to make a finding of a strong potential for such conduct in the future.

*Id.* at 304, 508 A.2d 964.

In the instant case, the circuit court explicitly considered each of the factors. Regarding Mother and Father's ability to communicate and reach shared decisions, the court observed that "the parties have not been able to set aside their differences and work together to do what is in [Daughter]'s best interests." The court also found that Father was verbally, emotionally, and physically abusive towards Mother in the past, which affected their ability to communicate. Significant evidence in the record supported the court's conclusion that the parents struggled to communicate, including conflicts about Daughter's therapy, conflicts regarding selected Satur-

day or Sunday as the visitation day, and Father's history of trying to intimidate Mother.

Father argues that, because the court resolved one potential area of conflict, joint custody was appropriate. The court ordered that Father's visitation would occur on alternate Sundays. The previous visitation order allowed Father to select either Saturday or Sunday as the visitation day on alternate weekends. Father believes that a significant source of the conflict between the parties centered upon the selection of the visitation day. Accordingly, he argues that because there will be no selection of the visitation day in the future, that source of conflict has been eliminated, and joint legal custody is appropriate.

Father's argument ignores the fact that there were other significant areas of conflict between Mother and Father. Although it is not required for joint legal custody that parents "agree on every aspect of parenting ... their views should not be so widely divergent or so inflexibly maintained as to forecast the probability of continuing disagreement on important matters." *Reichert v. Reichert,* 210 Md.App. 282, 306, 63 A.3d 76 (2013). Indeed, given that Father believed Mother had engaged in a conspiracy—culminating in two criminal trials—to concoct false sexual abuse allegations solely for the purpose of precluding Father from obtaining access to Daughter, it was reasonable for the circuit court to conclude that Mother and Father's ability to communicate was poor.

The court also considered the other *Taylor* factors, finding that neither parent had expressed desire for a joint custody arrangement. The court further found that Mother and Daughter shared a close relationship, and the distance of the parents' homes did not lend itself to a shared custody arrangement. In concluding that sole legal custody was appropriate, the circuit court emphasized that it was particularly concerned about the parents' ability to communicate effectively and reach shared decisions regarding Daughter's welfare. Having determined that joint custody was inappropriate, the court granted sole legal custody to Mother, finding that she has

been primarily responsible for Daughter's education and medical needs, and that Mother was also going to continue to have primary physical custody.

The circuit court was well within its discretion in making its determination that joint custody was inappropriate and Mother should be granted sole custody. The circuit court's ruling was based upon sound legal principles and factual findings that were not clearly erroneous. Accordingly, we find the circuit court's award of sole legal custody to Mother was not an abuse of discretion.

### III. Attorney's Fees

Finally, Father contends that the court abused its discretion in awarding attorney's fees to Mother because it failed to consider Father's ability to pay. Family Law Article § 12–103 authorizes a trial judge to make an award of counsel fees to one party from the other under certain conditions. The section provides:

(a) In general.—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; or

(2) files any form of proceeding:

(i) to recover arrearages of child support;

(ii) to enforce a decree of child support; or

(iii) to enforce a decree of custody or visitation.

(b) Required considerations. Before a court may award costs and counsel fees under this section, the court shall consider:

(1) the financial status of each party;

(2) the needs of each party; and

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

(c) Absence of substantial justification.—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

FL § 12–103.

Here, Mother requested reimbursement for her legal fees which was granted by the circuit court. Mother incurred counsel fees in excess of $40,000, of which Father was ordered to reimburse her for $15,000. The record demonstrates that the circuit court sufficiently considered all three factors pursuant to FL § 12–103(b) in recommending to the circuit court an award of counsel fees. The court assessed the financial status and needs of each party, noting that both parents were employed, but that Father "has the ability to earn more than twice what [Mother] has the ability to earn." The court also considered that Father, having represented himself, had incurred no legal fees in the custody proceeding, although the court recognized that Father incurred significant legal fees in the associated criminal proceeding. The court observed that Mother "has a lot of difficulty in making ends meet" and often had to rely upon her mother's financial assistance. Father had also testified regarding various real estate he owned, while Mother owned no real estate and had no assets. There was no evidence presented showing that Father struggled to maintain his financial needs.

The circuit court also considered whether there was substantial justification for bringing, maintaining, or defending the proceeding, finding that "[b]ut for [Father's] acts of abuse, which I found occurred, I do not think we would have been here for a five day modification of custody case." The court noted that the case was complicated and required significant discovery and preparation. The court, having reviewed the bills from Mother's counsel, found that the hourly rate and time expended were fair and reasonable.

The circuit court engaged in the required analysis under § 12–103 of the Family Law Article in concluding that attorney's fees should be awarded to Mother. Upon our review of the record, we conclude that, under the circumstances, a contribution by Father of $15,000 is reasonable. We agree with the circuit court that, given the unique circumstances of this case, Mother "absolutely had substantial justification in bringing this action" and "was absolutely justified in defending against [Father's] claim for custody." We expressly reject Father's bald assertion that the circuit court did not engage in sufficient analysis to justify the award. Indeed, the attorney's fees awarded are clearly justified based on the facts and circumstances of this proceeding. Accordingly, the circuit court did not abuse its discretion in awarding Mother attorney's fees.

For the reasons set forth above, we affirm the judgment of the Circuit Court for Anne Arundel County.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**